David SEIGAL and Ethel Seigal,
Plaintiffs,

v.

David MERRICK, William T. Gossett, William R. Hearst, Jr., F. Warren Hellman, H. Blackmer Johnson, John H. Johnson, William C. Keefe, Ralph F. Lewis, Malcolm A. MacIntyre, Harry J. McIntyre, John T. Pollock, Dennis C. Stanfill, Gordon Stulberg, Gerald Trautman, and John L. Vogelstein, Defendants,

Twentieth Century Fox-Film Corporation,
Defendant-Appellant-Cross-Appellee,

and

Norman Annenberg, Esq.,
Appellee-Cross-Appellant.

Harry GEHLER, Plaintiff,

v.

William R. HEARST, Jr., H. Blackmer Johnson, John H. Johnson, William C. Keefe, Malcolm A. MacIntyre, David Merrick, Harry J. McIntyre, John T. Pollock, Ralph Lewis, Dennis C. Stanfill, Gordon Stulberg, Gerald A. Trautman, William T. Gossett, Defendants,

Twentieth Century Fox-Film Corporation,
Defendant-Appellant-Cross-Appellee,

and

Norman Annenberg, Esq.,
Appellee-Cross-Appellant.

Nos. 239, 240, Dockets 79–7420, 79–7444.

United States Court of Appeals,
Second Circuit.

Argued Jan. 7, 1980.

Decided March 17, 1980.

See also, D.C., 441 F.Supp. 587.

Max Freund, New York City (Rosenman, Colin, Freund, Lewis & Cohen, New York City, Joseph Zuckerman, and Marc S. Dreier, New York City, of counsel), for defendant-appellant-cross-appellee Twentieth Century Fox-Film Corporation.

Norman Annenberg, New York City (Griffith G. deNoyelles, Jr., New York City, of counsel), for appellee-cross-appellant Norman Annenberg, Esq.

Before MOORE, FRIENDLY and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Twentieth Century Fox-Film Corporation (Fox) appeals and Norman Annenberg, an attorney, cross-appeals from an order of the District Court for the Southern District of New York awarding fees to Annenberg and Colman Abbe, an expert employed by him, for their services in successfully objecting to an improvident settlement of derivative actions by stockholders of Fox. The district court, endeavoring to follow the teaching of *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2 Cir. 1974) (Grinnell I) and 560 F.2d 1093 (2 Cir. 1977) (Grinnell II), awarded Annenberg $256,436 in legal fees and $1,519.34 in disbursements, and Abbe $12,225 for his services as an expert witness. See [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,-867 (April 27, 1979). Fox appeals from the awards to Annenberg and Abbe; Annenberg cross-appeals from the award to him, claiming it to be inadequate. The briefs stretch over 234 pages, Annenberg's alone being 128 pages long; the appendix runs to 1,119 pages. We have considered affirming on the simple basis that fee awards in such litigation lie in the district court's discretion, see *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 114 (3 Cir. 1976) (en banc) (*Lindy II*); that the district court's decision should stand if it has applied the correct criteria even if we would have ruled differently in certain respects, *id.* at 116; and that, in any event, appeals from fee decisions are not to be encouraged. However, certain unusual characteristics of this case dictate a more extended analysis and a different result.

The stockholders' complaints, filed in late May and early June, 1974, asserted that the defendants, directors of Fox, violated the federal securities laws and breached their common law fiduciary obligations in causing Fox to purchase 241,000 shares of its stock in March, 1974 on a public tender offer for 2,000,000 shares at an average price of $9.58 a share and then purchasing another 747,900 shares at approximately $9.02 per share from defendant David Merrick as part of a settlement of an action brought by Fox against Merrick for having interfered with its tender offer. On February 11, 1977, the parties to the actions, which had been consolidated, entered into a stipulation of settlement. This provided that Fox would receive from the directors (or in one instance from the director's insurer) $1,138,500 in cash and also certain consideration furnished by Merrick which Fox valued at $200,000. However, in return for the cash payment, the directors were to receive rights to purchase 425,000 shares of unregistered Fox stock together with the power to compel registration under certain circumstances. The exercise price was $13.25 per share, as against a closing price of $11.375 on the New York Stock Exchange on the day preceding execution of the stipulation and an average closing price

of $10.46 during the preceding 90 days. The rights could not be exercised until one year after initial court approval of the stipulation or the date when approval became final, whichever was later. Thereafter the rights would be exercisable for three years. The rights were subject to usual restrictions designed to insure compliance with the registration requirements of the Securities Act of 1933. The objecting stockholders and the parties to the settlement disagreed on the extent to which the stipulation also restricted the public sale of shares issued pursuant to the exercise of the rights.[1]

On May 13, 1977, Annenberg as attorney for a Fox shareholder filed objections to the adequacy of the settlement and of the notice given to the stockholders. The gravamen of the objections was the issuance of the rights. Whereas the notice asserted that these were worth 80¢ per right, or $340,000 in total, the objections claimed the rights had a value in excess of the $1,138,500 which the directors were paying and that the settlement must thus be found unfair without any need to examine the value of the claims Fox was to abandon. Later, with the spectacular success of Fox's film "Star Wars" which was released on May 25, 1977 and the attendant substantial rise in the price of Fox stock, the issues were broadened to include whether information on the prospects of "Star Wars" was withheld from the settling stockholders when the settlement was negotiated.

At the hearing on October 11–14, 1977, Fox conceded that, with its stock having doubled in price, the settlement would not be fair if the negotiated, but nevertheless asked for approval[2] on the ground that it was fair on the day the stipulation of settlement was signed.[3]

On the basis of the testimony of objector's expert Colman Abbe, the court found that, whereas the open market value of a right may have been only $.80, as testified by defendant's expert, the rights were worth $3.50 to the recipients and especially to defendant Vogelstein, who was allotted the lion's share of the rights (89%) under a separate agreement among the defendants, and who, under the stipulation, was permitted to assign his rights to EMW Associates Incorporated, Fox's largest single shareholder.[4] The court reasoned that the distinction between defendants' $.80 market valuation and plaintiff's $3.50 valuation hinged primarily on the import of restrictions on the rights and the sale of the underlying Fox shares imposed by the stipulation, see note 1 *supra*. It further determined that defendant Vogelstein, the pri-

1. This disagreement centered on two apparently conflicting paragraphs of the stipulation, one of which seemed to postpone transfer of the rights for the purpose of including a public offering for one year after the rights became exercisable while the other permitted the holder of 50% or more of the rights to compel registration of shares issued pursuant to their exercise immediately upon exercise. The district court's valuation principle, discussed *infra*, rendered a choice between these divergent readings of the stipulation unnecessary.

2. Fox's Board of Directors elected to make continued authorization of the settlement contingent on plaintiffs' continuing support; as plaintiffs stood by the agreement, so did Fox.

3. Authority is sparse on the question of what weight, if any, a court should attach to developments between the settlement and the settlement hearing in derivative suits and other actions where it shoulders the delicate responsibility of scrutinizing settlement terms. See *Newman v. Stein*, 464 F.2d 689, 691–92 (2 Cir. 1972); *Saylor v. Lindsley*, 456 F.2d 896, 904 (2 Cir. 1972). We have noted before that a reviewing court should give "realistic consideration" to post-settlement facts "which either reinforce or undermine the original decision to settle," *Newman v. Stein, supra*, 464 F.2d at 696, and it is difficult to envision the chancellor sanctioning a transaction whose terms have become markedly unfavorable for his ward. Yet a telling argument may also be made on the other side, namely, that the defendants in such actions would be bound if pre-hearing developments render settlements unfavorable to them, see, e. g., *Beecher v. Able*, 575 F.2d 1010 (2 Cir. 1978), and that settlements might be deterred by an asymmetrical rule favoring only plaintiffs and objectors. We find it unnecessary to decide this issue.

4. Vogelstein was president of EMW Associates Incorporated, which had purchased 662,000, or 8.7% of Fox's outstanding shares prior to the settlement and which would own approximately 14% of Fox's outstanding shares if it exercised Vogelstein's rights under the stipulation.

mary recipient of the rights, had no intention of selling shares that might be accumulated pursuant to exercise of the rights, and hence that the stipulation's restrictions did not affect the value of the rights to Vogelstein, whatever their impact on other buyers. Believing that the appropriate valuation was what the rights were worth to the recipients, since Fox had a duty to obtain that amount, the district court found the value of the rights as of February 11, 1977, to be $1,487,500, as against either the $1,138,000 that the directors were to pay under the settlement terms or the meager $340,000 ($.80 × 425,000) that the directors claimed was fair consideration for the rights.[5] Realistically, the court found, Fox would be paying the directors $349,000 to settle its action against them. Accordingly she disapproved the settlement. On the other hand, the court found no evidence that the defendants had inside information about the probable spectacular success of "Star Wars" when the settlement was negotiated.

Both the plaintiffs and the defendants-directors appealed to this court from the order of disapproval. However, on March 15, 1978, after several conferences under this court's Civil Appeals Management Plan, Annenberg and counsel for plaintiffs, the defendant directors, and Merrick entered into a new agreement (the "appellate settlement"), to which Fox stated it did not object. With some modifications and additions, the appellate settlement incorporated the terms of the original stipulation but increased the payment to be made by the directors for the 425,000 rights by $191,750

and the exercise price from $13.25 to $14.25 per share.[6] In addition, plaintiffs' counsel were to receive fees of $375,000 plus disbursements and expenses and Annenberg was to be paid $185,000, a sum that was to include the fee and expenses of Abbe. The parties opined that no further notice to stockholders or hearings by the district court was required, not even concerning the negotiated attorneys' fees. This court was requested to enter an order dismissing the appeals and directing the district court to enter judgment in accordance with the stipulation. After actions unnecessary to detail, this plan was aborted.

Fox and the objectors then moved to dismiss the appeal from the order disapproving the settlement for want of appellate jurisdiction. Annenberg carried the burden of the motion, which this court granted in an opinion by the late Judge Gurfein, *Seigal v. Merrick*, 590 F.2d 35 (1978).

When the case returned to the district court, Annenberg renewed an earlier application for fees. He sought $734,287.50 for himself and $12,225 for Abbe. His application showed 1204 hours of his own time devoted to the case and 938.50 of an associate's, deNoyelles. Judge Motley deducted time spent in preparing the fee application, for overbilling, for work on the appellate settlement, for four hours devoted to a motion to be designated lead counsel, and for "duplicative work", to wit, the presence of both Annenberg and deNoyelles at conferences and court appearances. She then

---

5. This conclusion relieved the district court of having to resolve disputes over the scope of the restrictions established by the stipulation, see note 1 *supra*, and over the impact of the restrictions on the market value of the rights. Since the question whether the rights were correctly valued on the basis of their apparent value to Vogelstein is not before us, we express no opinion on it.

We note, however, that defendants' expert would have placed a market value on the rights "in excess of $3"—a sum close to Abbe's valuation—in the absence of restrictions on the rights and underlying shares during the initial two years of the rights' four-year term. In addition, we note that publicly-traded warrants

similar to the rights here ordinarily lose little of their premium value as a result of a shortened life span until the last two years of their term, when their premium falls rapidly. See Shelton, The Relation of the Price of the Warrant to the Price of Its Associated Stock, *reprinted in*, Modern Developments in Investment Management 730, 731, 747 (J. Lorie & R. Brealey, ed.) (1972). Thus it might have been possible to reach Judge Motley's result through conventional market valuation techniques.

6. On the day before the appellate settlement, March 14, 1978, Fox stock closed at $24⅞ per share.

subtracted 10% of the balance for time spent on "unfruitful legal theories", namely, the theory about "Star Wars". Using figures of $100 per hour for Annenberg and $50 for deNoyelles, she arrived at a "lodestar" figure of $128,218 which she doubled in light of the litigation risks run by Annenberg and what she considered the complexity of the issues posed by the case. Abbe, Annenberg's expert, received the full amount that he requested. These appeals followed.[7]

The plethora of arguments raised on this appeal fall into four areas: the timing of the district court's order; its computation of the "lodestar" figure or the base-line determination of the value of Annenberg's efforts on Fox's behalf; the magnitude of the benefit conferred by Annenberg and the attendant issue of the appropriate increase, if any, in the lodestar figure; and the propriety of Abbe's fee award.

Fox first objected that the awards were premature since the benefit conferred by Annenberg on Fox was still indeterminate. The argument was that if the original plaintiffs prevailed for a sum larger than the settlement, the defendant-directors might successfully appeal on the ground that they have been wrongfully deprived of its fruits. This contention, scarcely appealing on the facts of this case in any event, is now moot. On Fox's motion, the court below recently dismissed the original complaints after a special review committee of disinterested directors, assisted by independent counsel, had concluded that the derivative action was not worth pursuing. See *Seigal v. Merrick*, 74 Civ. 2475 (S.D.N.Y. Dec. 20, 1979).

■ We have only minor cavils with the district court's computation of the "lodestar" figures.[8] Although class actions, derivative suits, and indeed, litigation in general, doubtless present many instances of duplicative work including the overstaffing of conferences and court appearances, we would be more reluctant than the district court to deprive a lawyer of the aid of even one associate in conferences or court appearances when, as here, he was often confronted with a bevy of hostile lawyers for the multiple parties on the other side (the plaintiffs, the defendants and the corporation); however, we leave this finding undisturbed.[9] On the other hand, we do not approve the deduction for work on legal theories that proved "unfruitful" but were not found to have been frivolous. Lawyers

---

7. The judge incorporated in her order a certificate conforming to Fed.R.Civ.P. 54(b). An award of attorney's fees does not fall within the ambit of Rule 54(b) certification, which is directed toward determinations of the parties' claims. See *Swanson v. American Consumer Industries, Inc.*, 517 F.2d 555, 560–61 (7 Cir. 1975). However, we have appellate jurisdiction under the collateral order doctrine. *Cohen v. Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Lowe v. Pate Stevedoring Co.*, 595 F.2d 256, 257 (5 Cir. 1979). Indeed, an early case permitting appeal from an order awarding fees before conclusion of the underlying litigation was a precursor of the *Cohen* collateral order doctrine. See *Trustees v. Greenough*, 105 U.S. 527, 531, 26 L.Ed. 1157 (1882).

8. In *Lindy II, supra*, 540 F.2d at 117, Judge Aldisert made a pertinent observation concerning his court's earlier decision in the same case, *Lindy I*, 487 F.2d 161 (3 Cir. 1973), on which this court relied in *Grinnell I, supra*:

We find it necessary also to observe that we did not and do not intend that a district court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It was not and is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work.

9. Ample authority supports reduction in the lodestar figure for overstaffing as well as for other forms of duplicative or inefficient work. See, e. g., *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5 Cir. 1974); *Steinberg v. Carey*, 470 F.Supp. 471, 478–79 & n.35 (S.D.N.Y.1979) (Weinfeld, J.). As such reduction is discretionary, however, there are no hard-and-fast rules; the district court "is justified in relying on its own experience as well as its knowledge of events in the particular case," *Steinberg v. Carey, supra*, 470 F.Supp. at 479. Thus, despite our inclinations here, we lack sufficient familiarity with the course of the litigation below to disturb this finding by the district court.

for plaintiffs and objectors in derivative or class actions, no less than other litigators, must evaluate, accept and prosecute suits on the basis of the entire spectrum of theories that show early promise of vindicating their clients' rights. Every lawyer, indeed every judge, has pursued blind alleys that initially seemed reasonable or even professionally obligatory. To reward only the pursuit of a successful theory in cases such as this undercompensates the inevitable exploratory phases of litigation, and may also invite overly conservative tactics or even prohibit some high-risk but deserving actions entirely.[10] The district court has ample tools to prevent abuse. In addition to scrutinizing the nature of the theories that turned out to be unproductive and the amount of time spent on them, a court could include all or part of the time in the lodestar but not subject it to a multiplier or at least not increase it in the same proportion as work that turned out to be productive.

■■■ We approve all the other disallowances. Annenberg recognizes that work on a fee application is not to be counted when the fee will reduce the fund obtained in a class action but claims there is a significant difference with respect to a derivative suit. There is no such difference since the diminution of corporate assets through fee awards in derivative suits is essentially similar to the diminution of a fund through such awards in class actions. See *Shlensky v. Dorsey*, 574 F.2d 131, 150 (3 Cir. 1978). *Gagne v. Maher*, 594 F.2d 336 (2 Cir. 1979), relied on by Annenberg to distinguish derivative suits from class actions, involved a fee application under the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988,

which could have no adverse effect on the beneficiaries of the underlying suit, *id.* at 344. The deductions for overbilling in the preparation of interrogatories and the motion to supersede the attorneys for the original plaintiffs after the appellate settlement, in which Annenberg had also participated, were likewise proper. Lastly, we turn to the so-called appellate settlement. While there is no general principle disallowing time spent in attempting to achieve an adjustment after an appeal has been taken, the nature of the appellate settlement was such that, for reasons developed below, the efforts devoted to it not only should be disallowed but should be considered a negative factor in evaluating the quality of Annenberg's representation.

If all that Annenberg accomplished was to save the $349,000 which the district court found that the settlement would have cost Fox as of the settlement date, February 11, 1977, the lodestar figure of $128,218 would constitute ample, indeed excessive, compensation, even recognizing its contingent character. The case for doubling the lodestar figure must rest on a claim that Annenberg conferred much larger benefits that appear if we value the results of his efforts as of the date of one or another procedural benchmark during the demise of the proposed settlement, i. e., as of a post-settlement date when the value of Fox stock, and hence of the rights allocated to the defendant directors under the settlement, had risen far above their respective levels on the settlement date. The latter course was adopted by the district court. It seems entirely permissible to do this in awarding fees, even if it would not be in passing on the fairness of the settlement, see note 3

10. Fox's contrary authority is unpersuasive. *Altman v. Central of Georgia Ry. Co.*, 188 U.S. App.D.C. 396, 580 F.2d 659 (D.C.Cir.1978), denied fees for a multi-year litigation effort that was unproductive to the point of frivolity. Moreover, the occasional denial of compensation under § 4 of the Clayton Act, 15 U.S.C. § 15, for the pursuit of unproductive theories in antitrust actions rests on the statutory policies of that provision. *Compare FLM Collision Parts, Inc. v. Ford Motor Co.*, 411 F.Supp. 627, 633 (S.D.N.Y.1976), rev'd on other grounds, 543

F.2d 1019 (2 Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977) (disallowing compensation *inter alia* for time spent pursuing "unsuccessful theories of liability") *with Pitchford Scientific Instruments Corp. v. Pepi, Inc.*, 440 F.Supp. 1175, 1178 (W.D.Pa. 1977), aff'd 582 F.2d 1275 (3 Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 242 (1979) (compensating, under § 4, litigation of all issues "that a reasonable and prudent antitrust lawyer would have litigated").

*supra.* During the October, 1977 hearing on the settlement, the time adopted by the district court, the excess of the value of the rights over the amount payable by the director-defendants would have been $1,602,-750 on the figures used by Fox's expert; on what seem to us the more reasonable figures used by Abbe, the excess would have been $4,811,500. At the time of our decision of December 16, 1978, dismissing the appeal, and of the fee hearing, March 9, 1979, the excess would have been still higher.

In this case, however, Annenberg's claims for compensation on the basis of having conferred benefits of the magnitudes recited above ring somewhat hollow in light of his consent to the appellate settlement.

If the February 11, 1977 settlement would have been unfair if executed in October, 1977, as Fox conceded, it would have been *a fortiori* so when the appellate settlement was executed on March 15, 1978, and Fox stock was selling at $24⅞. Yet Annenberg assented to a new settlement agreement whereby, in consideration of the payment of $1,329,750 the director-defendants would receive four year rights (exercisable after one year) [11] to subscribe at $14.25 per share for Fox stock then selling at 1.75 times that much. All that Fox gained by the slight improvement in terms was to avoid the risk that this court, either holding the order disapproving the settlement was immediately appealable or on a review of the final judgment, might decide that Judge Motley had abused her discretion in rejecting it. Annenberg must have known that under the circumstances the chances of this were minimal. Counsel for all parties should also have known that the appropriate procedure when a settlement or a revised settlement of a class or derivative action is reached while the case is under appeal is to request the court of appeals to remand to the district court for that court's consideration. It is hard to escape the suspicion that a prime factor in the consent of both Annenberg and plaintiffs' counsel to

the appellate settlement was the provision fixing their respective fees without the notice and hearing required by Rule 11D of the District Court for the Southern District of New York. This conduct should be taken into account by the district court before applying a multiplier to the lodestar amount.

■ Fox also objects to the award of any compensation to Abbe on the ground that this would violate New York Disciplinary Rule 7–109(C) which stated in pertinent part:

> A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case.

It claims that Abbe's fee was necessarily contingent since Ms. Koby, the objector, owned stock worth less than $1,000; it contends also that Annenberg and Abbe deceived the court by stating, when objection was made on this ground to Abbe's testimony, that Annenberg had agreed to pay Abbe $150 an hour—an agreement that itself allegedly would have conflicted with established rules against attorney agreements to bear the costs of litigation, see N.Y. Disciplinary Rule 5–103(B); N.Y. Ethical Consideration 5–8—when in fact no such intention existed. In support of these arguments, Fox relies on our decision in *Person v. Association of the Bar of the City of New York*, 554 F.2d 534 (2 Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977), which sustained N.Y. Disciplinary Rule 7–109(C) against constitutional challenges.

The $150 an hour compensation agreement between Annenberg and Abbe is not contingent on its face. Fox's allegation of contingency rests rather on the doubtlessly sound prediction that if the objection had failed, Abbe would not have attempted to collect anything like $150 an hour for his services. But we find nothing in the N.Y. Disciplinary Rules to preclude such voluntary forbearance, which in fact seems to be one of several established methods of miti-

---

**11.** The appellate settlement also established that shares issued pursuant to the exercise of the rights could not be sold for one year after the rights became exercisable, see note 1 *supra.*

gating the hardships that overly expansive reading of N.Y. Disciplinary Rule 7–109(C) might otherwise inflict. See *Person, supra,* 554 F.2d at 539; cf. *Matter of Shore,* 67 A.D.2d 526, 415 N.Y.S.2d 878 (2 Dep't 1979) (construing expert witness agreement to fall outside ambit of N.Y. Disciplinary Rule 7–109(C) in stock appraisal proceedings). Moreover, in challenging the legality of Annenberg's agreement with Abbe, Fox failed to mention the final provision of N.Y. Disciplinary Rule 7–109(C) which provides that a lawyer "may advance, guarantee, or acquiesce in the payment of . . . [a] reasonable fee for the professional services of an expert witness." This clause would appear to exempt Annenberg's arrangement with Abbe. Indeed, if it did not, and if New York law prohibited the employment of an expert witness unless a party realistically expected to pay a substantial fee even in the event of failure, our *Person* decision indicates that a serious constitutional question might arise. We likewise see no merit in the claim that Annenberg and Abbe deceived the district court. Fox had ample opportunity to develop its contingency allegation during the October, 1977 hearing and the exchange of briefs over Annenberg's fee applications. That the district court admitted Abbe's testimony over Fox's protest and subsequently approved his fee application hardly means that it overestimated his prospects of compensation in the case of failure.[12] Rather, it suggests that the district court acted with full knowledge of Annenberg's arrangement with Abbe. Abbe rendered Fox a service ultimately worth millions of dollars and it ill behooves the company to object to the modest compensation awarded him.

We therefore affirm so much of the order as awarded a fee of $12,255 to Abbe. With respect to the award of a fee to Annenberg, we reverse and remand for further proceedings consistent with this opinion. No costs.

---

**12.** During the October, 1977 hearing, the district court pointedly determined that the objector herself owned only 50 shares of Fox stock and would receive no monies even in the event that the settlement was thwarted. In ruling on the import of *Person, supra,* for the admissibility question, the court also noted a possible breach of the Code of Professional Ethics. Yet Judge Motley implicitly dismissed this possibility in her fee award, which had only praise for Abbe's testimony.