**VULCAN SOCIETY OF WESTCHESTER COUNTY, INC.; et al., Plaintiffs,**

v.

**FIRE DEPARTMENT OF the CITY OF WHITE PLAINS; et al., Defendants,**

and

**Professional Fire Fighters Association, Inc., et al., Intervenors-Defendants.**

**No. 78 Civ. 911.**

United States District Court,
S. D. New York.

Feb. 25, 1982.

See also, D.C., 82 F.R.D. 379, D.C., 505 F.Supp. 955.

Teitelbaum & Hiller, New York City, for Vulcan Society of Westchester County, Inc., et al.; Richard Hiller, Herbert Teitelbaum, Richard O. Berner, New York City, of counsel.

Arthur J. Doran, Jr., Acting Corp. Counsel, Yonkers, N.Y., Epstein, Becker, Borsody & Green, New York City, for Yonkers defendants; Robert Villani, Asst. Corp., Yonkers, N.Y., Robert P. Borsody, Ronald M. Green, Susan Schenkel Savitt, Richard Lane Steer, Elliot J. Groffman, New York City, of counsel.

McGovern, Connelly & Davidson, New Rochelle, N.Y., for New Rochelle defendants; Frank H. Connelly, Jr., John A. Vasile, New Rochelle, N.Y., of counsel.

Rains & Pogrebin, Mineola, N.Y., for White Plains and Mount Vernon defendants; Bertrand B. Pogrebin, Bruce R. Millman, Paul J. Schreiber, Mineola, N.Y., of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for State defendants; Andrea G. Iason, Deputy Asst. Atty. Gen., New York City, of counsel.

Belson, Connolly & Belson, New York City, for intervenor-defendants; John J. Connolly, Nicholas R. Santangelo, New York City, of counsel.

## AMENDED OPINION

SOFAER, District Judge:

This has been a hard-fought employment discrimination case. Plaintiffs sought damages and major recruitment changes in the fire departments of four municipalities in Westchester County: Mount Vernon, New Rochelle, White Plains, and Yonkers. Plaintiffs challenged the job requirements for firefighters in those cities, their recruiting practices and policies, and the content of and weight given to the written tests for firefighter positions. In addition, plaintiffs sued the State of New York to secure changes in the tests the State Department of Civil Service ("DCS") prepared for firefighters. The purpose of the suit, and of the changes sought, was to increase the number of blacks serving those municipalities as firefighters.

Defendants made omnibus motions early in the litigation. They raised virtually every defense conceivable in an employment discrimination case. All contended that the organizational and individual plaintiffs lacked standing; that the Court lacked jurisdiction under Title VII of the Civil Rights Act of 1964, under 42 U.S.C. § 1981, and under 42 U.S.C. § 1983; that the applicable statute of limitations barred the suit as untimely; that the action was improperly brought under the fourteenth amendment; that defendants' good faith and lack of intention to discriminate immunized them from suit; that the state and city defendants were immune from liability under the eleventh amendment of the Constitution of the United States; that Yonkers was immune from liability because it was operating under the orders of an emergency control board; and that, with respect to the state defendants, Title VII of the Civil Rights Act of 1964 was inapplicable.

Discovery limited to these motions was undertaken. Motions related to discovery were heard and decided, as was a motion to sever made by the White Plains defendants. Defendants also opposed plaintiffs' motion to certify the case as a class action arguing that none of the Rule 23 requirements was satisfied. Plaintiffs moved to amend the complaint, which generated further work. On April 10, Judge Sweet ruled on all the pending motions. *Vulcan Society of Westchester County v. Fire Department of White Plains*, 82 F.R.D. 379 (S.D.N.Y.1979). He denied the motions to dismiss and for summary judgment, and certified various classes. Discovery then proceeded on the merits.

Virtually throughout this litigation, plaintiffs have sought and obtained forms of preliminary relief. The first effort to restrain the hiring of firefighters in the defendant cities was resolved by consent of the parties and approved by the Court. Subsequently, this agreement broke down with respect to Yonkers, which needed to hire firefighters. Plaintiffs opposed the hiring. The Court allowed a number of appointments, but required that a number of positions be kept open to protect plaintiffs' rights. On January 17, 1980, the United States filed suit against the same city and state defendants, raising the same charges of discrimination against blacks, and broadening the charges to include discrimination against Hispanics and women.

Settlement negotiations began among the parties soon after Judge Sweet's decision of April 10, 1979, and continued with many disruptions for more than a year through 1980. These negotiations led to the resolution of complex and politically delicate issues, including relief with respect to the improvement and validation of the written tests; modification of the physical agility test; changes in recruitment and training, in the system of ranking candidates, the method of grading examinations, the treatment of persons with prior convictions, or a history of drug abuse, or those without a high school diploma; the interim appointment of firefighters; establishment of hiring and promotional goals; damages for

some named plaintiffs and some unnamed class members; general injunctive relief and compliance, and cross-claims. The variety of local, state and federal policies and laws involved, the collective bargaining agreements already in effect in the cities, and the fact that sensitive political and human issues are at stake, all made a settlement complex and unusually difficult to achieve. *See generally Vulcan Society of Westchester County v. Fire Department of White Plains*, 505 F.Supp. 955 (S.D.N.Y. 1981) (opinion approving settlement).

Plaintiffs now seek attorneys' fees as the prevailing parties under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976), as amended by Pub.L. 94–559; and 42 U.S.C. § 2000e–5(k) (1976). Their attorneys have filed affidavits establishing a total of 3,288.25 hours of lawyer time, worth at their current billing rates some $385,550.00. This lodestar figure, they propose, should be increased by a multiple of 2.5, in recognition of the importance of this case, the special qualities of their services, and their achievements. The fee sought, therefore, is $963,875.00 (which plaintiffs apparently miscalculated as $963,-974.99). In addition, plaintiffs seek costs totalling $12,264.16, parts of which are opposed by the State of New York. Defendants oppose this motion for fees on numerous grounds. For the reasons that follow, a fee is clearly appropriate, and under the circumstances of this case a relatively modest multiple is warranted. Costs will be taxed by the Clerk for the amounts specified below.

## I.

■ Plaintiffs have prevailed, and are entitled to their attorneys' fees. 42 U.S.C. § 1988 (1976); 42 U.S.C. § 2000e–5(k) (1976). Plaintiffs have obtained substantial benefits for the class they represent, and for themselves. *See Gagne v. Maher*, 594 F.2d 336, 340 (2d Cir. 1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Defendants' claims to the contrary are extensively briefed but frivolous. The settle-

ment that some defendants offered to enter into before the EEOC was far less favorable to plaintiffs than the results obtained through this litigation, including dramatic increases in the number of blacks on the most recent firefighter lists. *See* Pl. Reply Memo. at 3–9; Reply Affidavit of Richard J. Hiller, Esq., especially ¶¶ 6–16. The consent judgments also secure major changes in the tests for firefighters, including validation requirements and a device for avoiding disparate impact. The written exam, moreover, is now only a qualifying test, not a ranking device. Having read the numerous conflicting affidavits and arguments on whether plaintiffs achieved or in fact obstructed the settlement, and related questions, and on the basis of long exposure to the parties and the attorneys, the Court finds that plaintiffs achieved a substantial victory, and that the defendants greatly exaggerate the significance of their early concessions. Judge Frankel's comments in *Aspira of New York, Inc. v. Board of Education of New York*, 65 F.R.D. 541, (S.D.N.Y.1975), are apposite here:

> The court wishes to retract nothing of its appreciation for defendants' affirmative contributions. At the same time, there can be no question of the "necessity" ... served by plaintiffs in their bringing ... the action. It is perfectly clear that the "compliance" achieved in this case would not have happened, certainly not as early or as thoroughly as it has, without the initial and continued impact of plaintiffs' action.

### II.

 The proper first step in calculating the fee that should be paid to plaintiffs is to establish the so-called lodestar figure "by multiplying the number of hours expended by each attorney ... by the hourly rate normally charged for similar work by attorneys of like skill in the area." *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977) ("*Grinnell II*"). The historic hourly rates claimed for plaintiffs' attorneys are $110 for Messrs. Hiller and Teitelbaum, $100 for Howard Rubin, and $80 for Richard O. Berner. These are reasonable rates, based on the expertise and competence demonstrated by all the individuals involved, and in light of the experience they bring to civil-rights litigation. *See* affidavits and resumes filed with Notice of Motion for Attorneys Fees'. Numerous reported cases have approved fees in this range for similar work, some in localities with lower wages and costs of living than exist in this district. *See, e.g., Keith v. Volpe*, 501 F.Supp. 403 (C.D.Cal.1980) (environmental protection and civil rights) ($117.50 per hour for senior counsel; $70/hour for staff counsel); and other cases cited in plaintiffs' papers, including the unreported decisions collected in Appendices A & B of Plaintiff's Notice of Motion For Reasonable Attorneys' Fees and Costs.

Much higher hourly rates have been awarded in securities and antitrust litigation, although the issues there are no more complex than in this case, and the social utility of encouraging those suits is certainly no greater than the benefits derived from this litigation. *See generally Torres v. Sachs*, 69 F.R.D. 343, 347 (S.D.N.Y.1975), aff'd, 538 F.2d 10 (2d Cir. 1976). On the other hand, this is not a case in which current as opposed to historic rates should apply, since the historic fees are reasonable under present economic conditions. On the other hand, the current fees are also reasonable, and seem particularly appropriate in light of the long delay in collecting the fees earned in this over three-year old case. The Court has considered this fact, however, in connection with the request for a multiple of the lodestar. Under the circumstances, the historic rates will be applied, on the assumption that a modest multiple is the proper method for offsetting the effects of inflation in connection with other meritorious considerations.

The total number of hours for which plaintiffs' attorneys seek compensation is 3,288.25. That number is made up of the following: Hiller (1500.25 hours), Teitelbaum (1189.75 hours); Berner (526.25 hours), and Rubin (72 hours). Each attorney's claimed hours expended is supported with a detailed history, including date of work,

description, and amount of time spent on each occasion. Billing practices were imperfect in minor respects, but any overstatements were more than offset by various conservative devices such as only charging for time exceeding one-quarter hour. *See* Pl. Reply Memo. at 62–63. The affidavits and supporting data convincingly establish that the hours claimed were actually spent in the manner indicated. They are entirely consistent with the Court's expectations as to the amount of work involved. These hours and rates yield a preliminary lodestar figure of $345,200.00.

■ Plaintiffs' burden with respect to time allocations regarding specific defendants is to identify those hours for which any defendant is *not* responsible; specific allocations are not necessary for the hours of joint responsibility. *See Stenson v. Blum,* 512 F.Supp. 680, 683 (S.D.N.Y.1981) (Sweet, J.); *Arkansas Community Organizations for Reform Now v. Arkansas State Bd. of Optometry,* 468 F.Supp. 1254, 1257–59 (E.D. Ark.1979). Plaintiffs have adequately identified those hours for which particular defendants are not responsible. Defendants are jointly and severally responsible for all other hours, except to the extent indicated below.

The claim advanced by some of the defendants that plaintiffs duplicated their efforts by using multiple attorneys is meritless. Plaintiffs often had more than one attorney present in court, but the need for multiple counsel was real and a proper use of legal resources. Plaintiffs in fact conserved resources by joining all defendants in one lawsuit; had the effort to sever the action succeeded, plaintiffs would have had to spend considerably more time on the combined actions, to the defendants' financial detriment. Defendants' counsel expended far more time defending this consolidated litigation than plaintiffs' counsel did in prosecuting it. The government's institution of a parallel action reduced the number of hours plaintiffs' attorneys spent, and to that extent benefitted defendants. Plaintiffs were reasonable in not leaving any more responsibility to the government's attorneys than they did.

■ The time spent on the present fee application should be included in compensable time. *E.g., Gagne v. Maher, supra,* 594 F.2d at 344. This is not a case in which fees are paid out of a "common fund." *Compare Grinnell II, supra,* 560 F.2d at 1102–03. Furthermore, defendants' opposition to this fee motion has been so vehement and extreme that they in effect have forced the expenditure of most of the hours required. The fact that plaintiffs' demand may be excessive does not justify wasteful or frivolous efforts to prevent the payment of any fee, including massive and duplicative filings by some defendants.

■ The municipal defendants also urge that fees should be lower in cases involving public bodies than in those involving private defendants. The capacity of defendants to pay fees is a factor that should be weighed, irrespective of whether the defendant is public or private. Furthermore, public entities are different from some private defendants, in that the people making policy within them change from time to time, and because any loss to a public entity is often a loss to innocent taxpayers. On the other hand, the people making policy for corporate defendants, for example, also change from time to time, and losses to corporations are passed on to shareholders, consumers, and through the tax laws to taxpayers, all of whom are often less responsible for corporate leadership than are the voting taxpayers of municipalities for their own elected leaders. Complexities such as these readily explain the Court of Appeals' warning that financial condition—ability to pay—should only be given substantial weight in cases of real or extreme hardship. *Cohen v. West Haven Bd. of Police Commissioners,* 638 F.2d 496, 506 (2d Cir. 1980).

This is not a case, however, in which the precise manner of treating municipalities, or unions, on attorneys' fees motions need be resolved. The fees imposed upon the defendants here are reasonable and within their means, as is partially demonstrated by their considerable expenditures on their defenses. Yonkers, in particular, litigated

this case as though it were a persecution; no expense appears to have been spared, however unnecessary. Lawyers must be vigorous in their clients' behalf, but this litigation was at times conducted too aggressively. In one especially surly and irrational display, the private attorney representing Yonkers at the time went to the Court of Appeals to ask that it enjoin the District Court from proceeding with a hearing. Any defendant who can finance such legal indulgences can pay the due proportion of the fees it causes to be incurred.

■ Defendants also seek, explicitly or implicitly, some form of credit for their "good faith" in reaching a settlement. No court could safely characterize any of the municipal defendants as having acted in good faith. The underlying disparities in employment ratios—which is what this suit was all about—may not have arisen by accident. The Court has been informed, moreover, that White Plains, New Rochelle, and Yonkers initially rejected settlements recommended by their attorneys, a fact which is noted only because the claim of good faith has been made. That all the lawyers worked hard to reach a settlement cannot establish good faith in any meaningful sense without a full evaluation of what caused the lawsuit; and the settlements have saved all the parties (and the Court) the task of trying to determine motives and whether discrimination occurred. Defendants, in short, are duly rewarded for their efforts to settle by avoiding the greater fees that further litigation might have caused.

■ Defendants seek to avoid payment for the large number of hours spent by plaintiffs on the high-school diploma issue. That issue was a legitimate one to raise, however; the requirement was even stipulated by the relevant parties to have had an adverse impact upon minorities. Furthermore, the hearing resulted in some gains for the plaintiffs, in that some cities modified their requirements. To the extent plaintiffs did not succeed in abolishing the high-school education requirement, their legal fees in connection with the effort are

nevertheless compensable, because the legal theory they pursued was far from frivolous. *Seigal v. Merrick*, 619 F.2d 160, 164 (2d Cir. 1980).

■ Some defendants claim that they should not be charged for the time plaintiffs spent fighting the unions' motion to intervene. The defendants did not oppose intervention, and plaintiffs' opposition was a dubious expenditure of legal resources. The hours spent on the motion—30.25 hours (Hiller 24.5 and Teitelbaum 5.75) valued at $3,327.50, Hiller Reply Affidavit ¶ 251—will therefore be excluded from the lodestar figure. Defendants also correctly contend that they should not be charged for the hours spent in opposing motions by the unions to enjoin settlement negotiations, and later to oppose the consent judgments. The defendants joined plaintiffs in opposing the unions' efforts in these respects, and should not be penalized. The hours were properly expended by plaintiffs, however, and must be charged to the unions, which caused the work, and against whom plaintiffs prevailed in this respect.

The union intervenors in fact present a special case. The EEOC found no probable cause to believe the unions were guilty of any illegal conduct. Moreover, the unions were not in a position to grant or deny the relief sought by plaintiffs. A suit against the defendants here did not amount to a suit against the unions. *Cf. Hutto v. Finney*, 437 U.S. 678, 699–700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978) *reh. denied* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); *Wisconsin Socialist Workers 1976 Campaign Committee v. McCann*, 460 F.Supp. 1054, 1058–59 (E.D.Wis.1978). Finally, the unions prevailed on some of the positions they sought to assert. They won their motion to intervene, and they succeeded in a few of their substantive aims.

■ None of these considerations, however, is sufficient to exempt the unions from paying proper attorneys' fees to plaintiffs in this case. First, the unions signed the consent judgment regarding New Rochelle, in which plaintiffs gained concessions

the unions had sought to block. The test for "prevailing party," under either Title VII or 42 U.S.C. § 1988, is one of substance not of form. *See generally Meriwether v. Sherwood*, 514 F.Supp. 433, 435 (S.D.N.Y. 1981) (collecting authorities). While the unions could not have been required to provide plaintiffs any part of the relief they sought, once the unions intervened as defendants they placed themselves in a position to prevent plaintiffs from obtaining relief. Then, they litigated vigorously in an attempt to deny plaintiffs various aspects of the relief that plaintiffs sought, and ultimately capitulated on much that they had opposed in the New Rochelle Consent decree.

Even where intervenors have not signed consent decrees they have been held liable for attorney's fees. In *Haycraft v. Hollenbach*, 606 F.2d 128 (6th Cir. 1979), a state-court judge intervened in a school desegregation case to present an alternative plan that would have prevented plaintiffs from obtaining the full relief that they sought. The Sixth Circuit upheld the District Court's power to award fees against the intervenor judge under 20 U.S.C. § 1617, which provides for the discretionary award of fees to prevailing parties in school segregation cases. The intervenor had no judgment entered against him personally, and plaintiffs could not have obtained any relief on the merits from him. But the court stated that "[t]he alternative desegregation plan proposed by appellant imposed a substantial barrier to the realization of the full constitutional rights of appellees. By prevailing on this issue, appellees advanced the public interest as well as their personal rights." 606 F.2d at 132. An award of fees has been made, in fact, even when the party generating costs lacked the credentials properly to intervene. *Moten v. Bricklayers, Masons and Plasterers Int'l Union*, 543 F.2d 224, 239 (D.C.Cir.1976) (awarding attorneys' fees against would-be intervenor to extent he had increased costs).

In this case, intervenors early became parties to the litigation. They litigated vigorously in opposition to many of plaintiffs' objectives, and struggled to prevent settlements the unions felt were against their interests. Their efforts imposed substantial costs upon plaintiffs, and plaintiffs prevailed over the unions' opposition on most of the issues involved, and particularly in obtaining settlements which the unions opposed. Thus, for example, the unions moved to prevent settlement negotiations from proceeding in their absence. They participated actively in hearings on whether Yonkers should be permitted to appoint 15 new firefighters during October 1979. They moved unilaterally to dissolve the TRO entered by the Court, and then filed notice of appeal, but did not pursue an appeal after conference. They opposed aspects of the consent judgments, with argument and briefs. These actions were not undertaken to protect the constitutional rights of union members. Compare *Kirkland v. New York State Dep't of Correctional Services*, 524 F.Supp. 1214 (S.D.N.Y. 1981) (union advanced and was vindicated in constitutional positions). Rather, they were done in an effort to retain existing hiring standards for firefighters, including certain selection criteria, allegedly in order to insure that union members would not be forced to work with and rely upon incapable co-workers. Finally, the unions signed the New Rochelle consent judgment.

Had the unions opposed the settlements as mere interested parties, within the relatively strict confines of the settlement hearings, or as amicus curiae, they would not have caused the expenses that their persistent activity inflicted. *See Chance v. Board of Examiners*, 70 F.R.D. 334, 340 (S.D.N.Y.1976). The Court has no doubt, in this connection, that the unions were second only to Yonkers in the amount of time and energy their demands and arguments required of plaintiffs' attorneys. Having chosen to participate as defendants, the unions must be treated as defendants, both to achieve the purposes of the law granting attorneys' fees to prevailing litigants in civil-rights litigation, and in order to avoid unfairly imposing upon the other defendants more than their fair share of plaintiffs' fees. One important exception must be

made to this ruling, however. Since the unions were refused permission to participate in settlement negotiations until after a draft settlement had been obtained, they should not be charged for the many hours spent on those efforts in their absence.[1]

A review of the affidavits and records relevant to this issue, especially those of Hiller and John J. Connolly, Esq., indicates that the extra time exclusively caused by union actions was not substantial. The Court's estimate of the time proved to be related exclusively to union actions on compensable issues is 24 hours, broken down as follows: Hiller (18.0); Teitelbaum (6.0). Total lodestar fees allocable exclusively to union activity, therefore, are $2,640.00. In addition, however, the unions must be charged with their due proportion of the fees incurred in connection with the motions for temporary restraining orders and preliminary injunctions in which the unions actively participated, and the contested settlements of New Rochelle and White Plains. The fair proportion of the unions' share on these matters is an equal part of the fees allocable to each stage, as discussed below. The amount charged the unions is not so great that it should be modified in any way because of the unions' financial condition. Sealed affidavits on the unions' financial resources satisfy the Court that the unions can pay the amount in full, over a short time if necessary; the amount's reasonableness is further demonstrated, moreover, by the fact that the unions have paid their own attorneys over $60,000 for conducting this litigation (which is itself a measure of the unions' intense activity). Declaration of John J. Connolly, Esq., Dec. 7, 1981, ¶ 4.

■ New York State seeks to avoid the payment of any attorney's fees, arguing that it is not an "employer" of plaintiffs under 42 U.S.C. § 2000e–2(a), or an "employment agency" under 42 U.S.C. § 2000e–2(b). But this argument misses the point. Whether or not it is an "employer," "employer's agent," or "employment agency," within the meaning of Title VII, the State is liable to plaintiffs for attorney's fees. This suit was brought under 42 U.S.C. §§ 1981 and 1983, as well as under Title VII. Neither of those statutes is limited to employers, and thus 42 U.S.C. § 1988 is an independent ground for recovery of attorney's fees. Moreover, the State signed the Consent Judgments in this case granting plaintiffs virtually all of the relief they sought, including significant modifications of the State's administration of the State Civil Service laws with respect to the hiring practices challenged here. Given its substantial control over the hiring practices of the city defendants, plaintiffs' and the municipal defendants' arguments that the state is an employer are "substantial." *Cf. Gagne v. Maher, supra,* 594 F.2d at 339–41. Since the plaintiffs prevailed over the state, the judgment is itself a sufficient predicate for the State's liability for fees. *Jose P. v. Ambach,* 669 F.2d 865 at 871 (2d Cir. 1982); *Holley v. Lavine,* 605 F.2d 638, 646 (2d Cir. 1979) *cert. denied sub. nom. Russo v. Holley,* 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980); *Gagne v. Maher, supra,* 594 F.2d at 339–41.

### III.

Defendants all dispute the manner in which any fees recovered should be allocated among themselves. Plaintiffs have unfortunately avoided an attempt to allocate fees, but they have identified for the Court the proceedings or issues to which fees are attributable, and have also specified the proceedings and issues that were clearly raised by or related to less than all the defendants. The other parties also commented on these issues.

---

1. In the event this Court's decision to allocate fees to the unions is nullified, then the time expended must be reallocated to the other defendants in accordance with the allocation decisions made in this opinion. A reconsideration would also be required of the Court's decision to refuse fees to plaintiffs for opposing the unions' motion to intervene. Such opposition would be entirely reasonable if unions are to be permitted to participate as parties without being responsible for fees. In fact, the Court would have denied intervention if it had assumed the unions could generate fees and costs without accountability, and would have instead allowed the union to participate only after a settlement had been obtained.

Plaintiffs are correct in their basic argument that the fees incurred should in general be divided equally among all the six principal defendants—New York State, the four cities, and the unions. The issues are all interrelated. When one party raised a particular question, all the parties usually became involved, because their interests were at stake. Nevertheless, as plaintiffs recognize, certain aspects of the litigation are solely attributable to one or more, but fewer than all, defendants. Fairness requires, therefore, that those matters be identified, and that fees be divided among only responsible defendants. Accomplishing this division entails complications.

Before commencing the allocation procedure, any hours disallowed must be deducted from the proposed lodestar figure. This step reduces the proposed lodestar to $341,872.50, since the only hours disallowed are those relating to the unions' motion to intervene.

The second stage of analysis is to identify those fees attributable to particular defendants. This has already been done with respect to the unions, which are solely responsible for $2,640.00 in fees. On the other hand, the unions must not be charged for any of the hours expended prior to their becoming a party. The hours involved total 381.75 (Hiller, 238.5; Teitelbaum, 143.25). New Rochelle and the State should not be individually charged for the 1978 proceedings for a TRO and preliminary injunction, as the issues there were relevant to, and involved, all the parties then in the case. Therefore, all the hours expended until the unions became intervenor defendants must be charged to all the other defendants. The total incurred is $41,992.50 or $8,398.50 for each responsible party. The proceedings concerning Yonkers, however, were peculiarly related to that city's needs, and to the results of firefighter tests administered for that city. The State played no role in those proceedings, and sought no relief. All the time associated with those proceedings must therefore be charged to Yonkers and the unions, who participated vigorously. The total hours expended were 106.25 (Hiller, 58.75 hours; Teitelbaum, 24.25 hours; Berner, 23.25 hours), for a total sum of $10,990.00, or $5,495.00 to each responsible party.

Fees generated by the high school diploma hearing should be allocated in equal parts to the two defendants who were active parties—White Plains, and New Rochelle. Yonkers, the State, and the unions attended and participated, but they were not required to do so, and had not agreed to the terms of the hearing or to be bound by its results. One exception to this is the effort of Yonkers to enjoin the hearing. Yonkers is solely responsible for the time required for that effort, which plaintiffs' attorneys informed the Court, on the basis of the time sheets, to be 27.25 hours (Hiller 16 hours, Teitelbaum 1 hour, Benner 10.25 hours), for a total cost of $2,690.00. The total hours expended on the hearing were 905.5 (Hiller 238.25 hours; Teitelbaum 514 hours, Berner 153.25 hours), for a total cost of $95,007.50, or $47,503.75 allocated to each of the two defendants responsible.

Hours spent by plaintiffs' attorneys on each of the settlements obtained in this case are also in general hours that relate to all the other cases. Nevertheless, at certain stages the hours were attributable to less than all the defendants. The hours spent on securing settlements with White Plains and New Rochelle must be attributed to those two cities, and the State. Total hours spent on this phase were 93.5 (Hiller, 69.25 hours; Teitelbaum, 5.5 hours; Berner, 18.75 hours), for a total amount of $9,722.50, or $3,240.84 for each of the three charged defendants. The hours spent in obtaining the Yonkers settlement should be allocated only to Yonkers and the State, the other cities having settled. The total of $251.5 hours expended, (Hiller, 157.5; Teitelbaum, 94), representing attorneys' fees amounting to $27,665.00, or $13,832.50 for each responsible party. Plaintiffs' attorneys have spent some hours implementing the consent judgments that are exclusively allocable to specific defendants. Thus, some 7.75 hours (Hiller 7.25, Berner 0.5) were spent on the White Plains judgment, totaling $837.50 in fees; 9.25 hours were spent (by Hiller) on

the Mount Vernon judgment, totalling $1,017.50 in fees; and 1.25 and 1.00 hours were devoted (by Berner) to Yonkers and New Rochelle respectively. Teitelbaum Supplemental Affidavit, ¶ 5. All hours not specifically allocated are attributable to all the defendants equally, including the hours devoted to this motion.

The total sums specifically allocated to individual parties are as follows:

| | |
|---|---|
| Yonkers | $ 30,516.00 |
| New Rochelle | $ 59,223.09 |
| Mt. Vernon | $ 9,416.00 |
| White Plains | $ 59,980.59 |
| New York State | $ 25,471.85 |
| Unions | $ 8,135.00 |
| Total | $192,742.53 |

This process leaves a total amount in the allowable lodestar fee equally attributable to all the defendants of $149,129.97, or $24,855.00 each. When this figure is added to the amounts specifically allocated to each of the six responsible parties, the resulting allocation of the allowable lodestar in dollar amounts and in percentage is:

| | | | |
|---|---|---|---|
| Yonkers | $ 55,371.00 | or | 16.20% |
| New Rochelle | $ 84,078.09 | or | 24.59% |
| Mt. Vernon | $ 34,271.00 | or | 10.02% |
| White Plains | $ 84,835.59 | or | 24.81% |
| New York State | $ 50,326.85 | or | 14.72% |
| Unions | $ 32,990.00 | or | 9.65% |
| Total | $341,872.53 | | 99.99% |

### IV.

Plaintiffs seek to increase the fee award by a factor of 2.5. *Grinnell II* authorizes adjustments or multipliers to the lodestar figure, but cautions that the primary measure of the value of services is the time expended. 560 F.2d at 1098–99. Here, plaintiffs have failed to demonstrate that a multiplier in the amount sought is justified. The litigation was largely free of risk. The underlying data on racial disparities in firefighter appointments were highly favorable to plaintiffs, and the EEOC had issued favorable findings and rulings. It was likely when the suit began that plaintiffs would ultimately meet the standard of prevailing parties.

The issues were complex, particularly the testing questions. But these matters are no longer novel. *See, e.g., Firebird Society v. Board of Fire Commissioners*, 433 F.Supp. 752 (S.D.N.Y.1976), *aff'd*, 556 F.2d 642 (2d Cir. 1977) (denying multiplier). Firefighter discrimination suits that raise similar questions have been decided during the last several years, some brought by these same plaintiffs. *E.g., Vulcan Society of New York City Fire Dep't. v. Civil Service Commission*, 490 F.2d 387 (2d Cir. 1973). Nor was this case so undesirable as to justify a large multiplier. It did pose burdens, since it was a major matter that had to be done entirely on contingency. But the prospect of recovery was good. Furthermore, while counsel achieved some notoriety and perhaps obloquy in certain circles, in our society a case such as this is generally recognized as necessary, and by many as highly laudable. Plaintiffs' attorneys in fact seem particularly interested in handling this type of litigation, and are good at it. Finally, the standing of plaintiffs' attorneys is high at the civil rights bar, but that consideration is to an extent accounted for in the hourly rates they have billed.

While the increase sought by plaintiffs would be unreasonable, a modest multiple of 1.5 (or a 50% bonus) is warranted in this case. The testing issues, among others, were complex. The litigation was extremely hard-fought, and did entail some risks; in addition, it required resilience and patience, as well as a long deferral on payment. Finally, the results achieved were exceptional, both with respect to the likelihood of minority members obtaining firefighter positions in very substantial numbers, and with respect to the types of tests that will henceforth be formulated by the State for these positions. *Cf. Beazer v. New York City Transit Authority*, 558 F.2d 97, 100 (2d Cir. 1977) *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (issues simple and few; benefits not concrete). This award will also serve to encourage private attorneys to accept on a contingent basis civil rights cases of substantial size and complexity. The Legal Defense Fund, Inc., as amicus, points out that civil rights organizations cannot handle all the litigation that should be

brought to protect the rights established by Congress in the Civil Rights Acts, and the private bar must be encouraged to handle these cases by receiving roughly the same fees paid to attorneys in comparable litigation. This is a valid point, at least as applied to cases such as the present one, which succeed in accomplishing major changes in the hiring policies and practices of municipal agencies, and which open up significant employment opportunities to minorities.

■■■ Although plaintiffs' attorneys are entitled to a multiplier to reward their efforts and achievements, the multiplier will not be applied to the substantial number of hours spent on the application for attorneys' fees. Courts have disfavored the application of multipliers to the fees incurred in attorney-fee applications. *Cintron v. Brentwood Union Free School District*, No. 77–1310 (E.D.N.Y. Feb. 6, 1979); *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 553·54 (S.D.N.Y.1979); *Munsey Trust v. Sycor, Inc.*, 457 F.Supp. 924, 928 (S.D.N.Y.1978); *Burger v. CPC International, Inc.*, 76 F.R.D. 183, 189 (S.D.N.Y.1977); *Barnett v. Pritzker*, 73 F.R.D. 430, 434 (S.D.N.Y.1977). Defendants have unnecessarily increased the costs of this motion, so an argument could be made for special treatment. But plaintiffs bear part of the responsibility for defendants' reaction. The request for a multiplier of 2.5, to be applied across the board, was unreasonably high under the circumstances in this case. It would have resulted in a fee of roughly $1,000,000, a figure that appears to have caused defendants such great concern that they apparently found it necessary to escalate the motion into a massive confrontation. Therefore, even assuming the Court has discretion to apply the multiplier to the time spent on this motion, it declines to do so.

The Court also declines to apply the multiplier to the fees awarded in connection with the high-school diploma hearing. As explained above, that issue was not frivolous, and therefore is properly compensable. Plaintiff's partial victory achieved very little, however. Even to the extent plaintiffs were successful on the issue, the terms of the consent judgment do not prohibit fire department personnel from considering an applicant's high school or college experience. In addition, the fact that a high school diploma will no longer be an absolute requirement is unlikely to make a significant difference in the proportion of minority applicants. As noted in the opinion approving the settlement of this case, "[t]he hearing established to the Court's satisfaction that the overwhelming majority of all firefighter applicants are likely to be high school graduates." *Vulcan Society of Westchester County v. Fire Dep't of White Plains*, 505 F.Supp. 955, 965 (S.D.N.Y.1981). It is the Court's duty in such circumstances to "scrutiniz[e] the nature of the theories that turned out to be unproductive and the amount of time spent on them" and "include all or part of the time in the lodestar but not subject it to a multiplier or at least not increase it in the same proportion as work that turned out to be productive." *Seigal v. Merrick, supra*, at 165. In light of the results obtained by the plaintiffs on this issue, the amount expended by the plaintiffs in litigating it will be included in the lodestar but will not be subjected to the multiplier, in order to reflect the minimal benefit conferred on the plaintiffs as a result of these efforts.

After excluding the hours spent on the high school diploma hearing and on the motion for attorneys' fees, the multiplier has the effect of granting plaintiffs' attorneys somewhat more than they would have obtained had their current hourly rates been applied; about one-half the total multiplier awarded is necessary to offset the effects of inflation. At historic hourly rates, the allowable lodestar figure is $341,-872.50. The amount expended on this application for attorneys' fees is $75,457.50, and the amount expended on the high school diploma hearing is $95,007.50. Subtracting the total of those amounts from the allowable lodestar yields the figure to which the multiple should be applied, or $171,407.50. By applying the multiplier of 1.50 to this figure, based on the historic rates, the total fee award is $427,576.25, or $257,111.25 plus

the $75,457.50 spent on this motion, and the $95,007.50 spent on the diploma hearing. Had the allowable lodestar been calculated on the basis of the rates currently charged by plaintiffs' attorneys, rather than the hourly rate, the allowable lodestar without applying any multiple would have been $381,768.75.[2] The bonus over current rates therefore amounts to only 12%.

Plaintiffs are hereby awarded attorneys' fees of $427,576.25, to be allocated as follows, based on the lodestar allocations and an application of the resulting proportionate responsibilities for the multiple awarded:[3]

Finally, the State argues that plaintiffs should only be awarded the costs ordinarily granted in civil litigation. If this view prevailed, plaintiffs would be denied the bulk of the $12,264.16 in costs that they seek, particularly costs associated with depositions. Few decisions have been reported on this issue in the context of awards to prevailing parties under Title VII and other civil-rights statutes. Those that exist support plaintiffs' application, in that the policies supporting the award of fees in Title VII litigation likewise support the award of necessary and reasonable costs. *See, e.g., Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir.) *cert. granted on other grounds sub*

*nom. Ledbetter v. Jones,* 453 U.S. 911, 101 S.Ct. 3141, 69 L.Ed.2d 993 (1981); *accord, Bolden v. Pennsylvania State Police,* 491 F.Supp. 958, 966–67 (E.D.Pa.1980). Congress wanted plaintiffs to be paid the costs of vindicating their rights, and the need for depositions, travel, telephone expenses, and other similar costs is as clearly supportable as the need to use counsel. *See* 122 Cong. Rec. 35,123 (1976) (remarks of Congressman Drinan). The costs actually sought in this case are reasonable, given the length and complexity of the litigation. They are granted in full, to be allocated among the defendants in accordance with the proportions in which they have been found jointly liable for the allowable lodestar. This formula yields the following cost allocation:

| | |
|---|---|
| Yonkers | $ 1,986.99 |
| New Rochelle | $ 3,016.06 |
| Mt. Vernon | $ 1,228.98 |
| White Plains | $ 3,042.05 |
| New York State | $ 1,805.46 |
| Unions | $ 1,183.62 |
| Total | $12,264.16 |

The Clerk will enter final judgment for fees and costs in the amounts specified above.

SO ORDERED.

---

**2.** The current hourly rates are $125 for Hiller and Teitelbaum, $100 for Rubin, and $80 for Berner. The total lodestar figure claimed at these rates would have been $385,550.00, which after deducting the time spent on the unions' motion to intervene ($3,781.25) would have yielded an allowable lodestar of $381,768.75. If the granting of a multiple is determined improper in this case, the Court would have awarded plaintiffs a lodestar fee based on current rates, in light of the need to offset the effects of inflation and to avoid deterring attorneys from handling major civil-rights actions on contingency.

**3.** The total fee less the allowable lodestar already allocated equals $85,703.72, which represents the total award beyond the lodestar. This sum has been allocated among the parties by attributing to each an additional 50% of its share in multipliable fees. Since New Rochelle, for example, was found responsible for $84,078.09 of the lodestar figure, but its sixth of the attorney's fees motion ($12,576.27) and its half of the high school diploma hearing ($47,503.75) are not subject to the multiplier, its share of the award beyond the lodestar is 50% of $23,998.07, or $11,999.03. That figure, added to the lodestar sum for which it has been found responsible, yields its total liability for attorneys' fees.