**STATE OF ARIZONA, Plaintiff,**

v.

**MARICOPA COUNTY MEDICAL SOCIETY, an Arizona non-profit corporation; Maricopa Foundation for Medical Care, an Arizona non-profit corporation; and Pima Foundation for Medical Care, an Arizona non-profit corporation, Defendants.**

**No. CIV 78–800 PHX EHC.**

United States District Court,
D. Arizona.

Jan. 20, 1984.

Kenneth R. Reed, Alison B. Swan, Asst. Atty. Gen., Phoenix, Ariz., for plaintiff.

D.J. McAuliffe, Snell & Wilmer, Phoenix, Ariz., for Maricopa County Medical Soc.

Paul F. Eckstein and Jennifer B. Beaver, Brown & Bain, Phoenix, Ariz., for Maricopa Foundation for Medical Care.

## MEMORANDUM AND ORDER

CARROLL, District Judge.

Plaintiff State of Arizona, as the prevailing party in this action, has moved for an award of attorneys' fees and expenses, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 (as amended 1976). The State's Petition is in two parts, one submitted on behalf of the Attorney General's Office and the other by Kenneth R. Reed (Reed), Special Counsel for the State.

■ Defendants Maricopa County Medical Society (Society) and Maricopa Foundation for Medical Care (Foundation), object to the amount of fees and expenses sought, as well as a requested multiplier of four (4).[1] Defendants contend that the requested award of more than $1,000,000 would be "outrageous and shock the conscience." For reasons which appear in this Memorandum, I agree. Fees allowed in cases such as this should be adequate to attract competent counsel; they should not produce windfalls to attorneys.

## APPLICABLE PROCEDURES IN FIXING FEE AWARD

■ Defendants acknowledge that plaintiff is entitled to receive "reasonable" attorney fees and costs as the prevailing party in this antitrust injunction proceeding. The plaintiff has the burden of proof with respect to its claim. This burden is met by filing an application with detailed supporting documentation to substantiate the claim. The party opposing the application must then submit specific and detailed objections. As Circuit Judge Tamn stated in his concurring opinion in *Nat. Ass'n of Concerned Vets v. Sec. of Defense*, 675 F.2d 1319, 1338 (D.C.Cir.1982):

... Just as the applicant cannot submit a conclusory application, an opposing party does not meet his burden merely by asserting broad challenges to the application. It is not enough for an opposing party simply to state, for example,

that the hours claimed are excessive and the rates submitted too high.

Here, the parties are in an adversarial status. Accordingly, the Court's consideration of the application is different than it might be if a similar claim was asserted against a governmental entity (an infinite ability to pay), *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980), or the award was to come from a common fund (the losing party no longer continues to have an interest in the fund and the contest is between the successful plaintiffs and their attorneys over sharing the "harvest of the lawsuit"), *Boeing v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 750, 62 L.Ed.2d 676 (1980). My conclusion that excessive time was logged both by Staff and Special Counsel will be considered in arriving at the final awards.

Both parties agree that this Court in determining an award should follow the procedures outlined in *Moore v. James H. Matthews & Co.*, 682 F.2d 830 (9th Cir. 1982). There, the Circuit Court articulated a so-called "blended" use of the lodestar analysis (hours expended multiplied by the hourly rate) and the several factors or guidelines adopted by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

A brief history of this proceeding will assist in understanding the issues to be resolved by the Court.

## BACKGROUND LITIGATION

This action was filed October 17, 1978, on behalf of the State of Arizona by the State Attorney General's Office, Antitrust Division. The defendants were the Maricopa County Medical Society, Maricopa Foundation for Medical Care, Pima County Medical Society and Pima Foundation for Medical Care.

The complaint charged a § 1 Sherman Act conspiracy to illegally fix maximum fees which could be charged by member

---

**1.** Pima Foundation for Medical Care's Response objected in generalities. It recounted its nonprofit status. Otherwise, it questioned the mo-

tives or judgment of the Attorney General in having filed the action.

doctors of the foundations for health services provided to policy holders of specified insurance plans. The State sought to enjoin a continuation of this practice. The complaint did not seek to recover damages.

Soon after commencement of the action, plaintiff filed a motion for partial summary judgment on the liability issue, arguing that the agreement to adhere to the maximum fee schedules was illegal *per se*. Discovery consisted of comprehensive requests for admissions, interrogatories and two depositions.

The district court denied the motion without prejudice pending receipt of further evidence, holding "that the Rule of Reason approach should be used in analyzing the challenged conduct."

The district court certified its order denying partial summary judgment for interlocutory appeal. The Ninth Circuit affirmed, *State of Ariz. v. Maricopa Cty. Medical Soc.*, 643 F.2d 553 (9th Cir.1980) (2–1 decision).

The United States Supreme Court granted certiorari. That Court, in a plurality opinion, held that the fee practice at issue was a *per se* violation under § 1 of the Sherman Act. *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

After remand, the parties stipulated to a form of permanent injunction by which maximum fee schedules would be fixed by an independent group including insurance company representatives.

This Memorandum will first consider the hours to be allowed, second, the hourly rates for counsel, and last, whether a multiplier is appropriate and, if so, what multiplier will be utilized.

## HOURS

The U.S. Supreme Court took occasion in *Hensley v. Eckerhart*, ── U.S. ──, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) to outline how a court should review a fee application of prevailing counsel:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

> The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.' S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

These procedures will be followed in this case.

The hours claimed for the Attorney General's Staff will be considered separately from those claimed by Special Counsel.

*Attorney General*—The Antitrust Division of the Arizona Attorney General's Office investigated and filed the complaint. Patricia A. Metzger, an Assistant Attorney General, essentially handled the case through the Ninth Circuit and the filing of the Petition for Writ of Certiorari.

Staff members continued to assist in the case after Special Counsel was retained on December 12, 1982, and certain of their time is questioned by defendants.

Excluding time related to preparing and arguing the fee petition,[2] the Attorney General in its Reply Memorandum sought compensation for the following hours:

### HOURS

| ATTY. | 1978 | 1979 | 1980 | 1981 | 1982 | Total All Years |
|---|---|---|---|---|---|---|
| Reed | 100 | 115.9 | 27.2 | | | 243.1 |
| Swan | | | .7 | | 25.9 | 26.6 |
| Metzger | 220.9 | 526.7 | 125.1 | 6.0 | | 878.7 |
| Goldstein | | .5 | | .5 | | 1.0 |
| Eger | | | 64.4 | 139.7 | | 204.1 |
| Paralegal | | | | | | |
| Crowley | | | .1 | | | .1 |
| Sirota | | 420 | 147.5 | | .4 | 567.9 |
| | | | | | | 1921.5 |

The time summary submitted with the Petition filed November 19, 1982, totalled approximately 1945 hours. The difference of approximately 23 hours reflects less time for Eger (18.6) and eliminates 5.5 hours for Paralegal David Armour.

Defendant Maricopa Foundation's specific objections relate to the following:

| ITEM | HOURS (approx.) |
|---|---|
| Pre-complaint investigation by Attorney General's Staff, 1978 | 18 |
| Paralegal Sirota, 1979 | 420 |
| " " 1980 | 148 |
| Amicus Brief, Gray Panthers, 1980–1 | 15 |

The prefiling investigative time is reasonable and will be allowed.

The Court in a telephone conference with counsel on October 7, 1983, requested additional information related to Paralegal Sirota's time. Thereafter, the parties submitted a stipulation that 284 hours of Sirota's time were compensable. The stipulated hours for Sirota appear reasonable and will be used in calculating the State's fee.

The Foundation's objections to State time for *amici curiae* purposes are limited to preparation of an *amicus* brief in the Ninth Circuit on behalf of the Gray Panthers. This time totals approximately 15 hours, of which 4.8 hours for Sirota has been adjusted by the Sirota stipulation. Three hours for Eger in 1981—"Gathering Material for Gray Panthers"—will be disallowed.[3]

The Foundation has not objected to time spent by Staff members in soliciting forty other states or interested groups to appear as *amici curiae* in this proceeding and subsequent communications with them.

■ The Foundation objects to Staff Attorney Eger's time in flying to and from Washington, D.C., (12 hours) and in being at counsel table during the Supreme Court argument (3 hours). Inasmuch as the State was a party to the proceeding, it was appropriate for a member of the Attorney General's staff to appear at the oral arguments.

■ The Maricopa County Medical Society's objections generally parallel those of

2. Issues regarding the Fee Petitions will be separately discussed.

3. The State notes that "the Pima Foundation has made no objection to the Attorney General's time. 'Pima has no quarrel … with the hard-time data submitted to the plaintiff. If the lawyers say they put the time in, they put the time in, and that is the end of it.'" It is this type of practice that has caused increasing concern both by the public and the courts as to the amount of attorney fees claimed in cases such as this. It also suggests why awards in other cases must be carefully examined to see if they were considered in an adversarial situation.

the Foundation. The Society (but not the Foundation) objects in particular to any award of attorneys fees on behalf of the State Attorney General's office after it contracted on December 12, 1980 with Reed to act as Special Counsel in the case. There is some merit to this position.

The Professional Services Agreement with Reed authorized him "to perform all services as attorney necessary or appropriate to the recovery of damages and other relief as may exist, whether by filing and litigating to completion an action or actions or other legal proceedings or otherwise."

It is fair to conclude that the Attorney General's role after December 12, 1980 was not contemplated to be that of lead counsel. The Professional Services Agreement expressly provided:

... Special Counsel [Reed] shall be paid as and for his Attorney's fee for professional services on behalf of Arizona the whole amount set by the court.

The State's post-December 12, 1980 time (exclusive of time related to the Fee Petition) is approximately 175 hours. This time consists largely of Eger's conferences with Reed, as well as services related to preparation of the joint appendix and his review of the Supreme Court briefs.

The Attorney General (Department of Law) has a duty under the Arizona Constitution and statutes to represent the State in legal proceedings. Arizona Constitution, Article 5 § 9; A.R.S. § 41-192(A). It would be unreasonable to construe the Professional Services Agreement as "waiving" these constitutional and statutory duties. The Society has failed to specify any time entries which it believes were not reasonably necessary.

The State seeks to be compensated for 100 hours in 1978 and 74.1 hours in the first five months of 1979 for services provided by Kenneth R. Reed as then Chief of the Antitrust Division. This time is stated to be "reconstructed from contemporaneously produced documents."

■ The burden is on the party seeking to be compensated for time spent on a case to provide supportive time records. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir.1974); *Lockheed Min. Sol. Coalition v. Lockheed M & S Co.*, 406 F.Supp. 828, 831 (N.D.Cal., 1976). An attorney's post facto review of the file, and a reflective judgment as to hours devoted to the project are not sufficient for this purpose. *National Ass'n of Concerned Vets*, 675 F.2d at 1327. The 174.1 hours claimed for Reed for 1978 and the first five months of 1979 are disallowed. I would note that a review of the time entries of other staff counsel, as well as the court filings, reflect limited apparent involvement by Reed.

As a matter of judgment, I have excluded Goldstein's time in 1979 and 1981, totalling one hour. The two entries of .5 each are of the type that an attorney exercising reasonable billing practice, would exclude. The June 5, 1979 time entry for Goldstein "Rv Opinion", while a minor item, is reflective of the lack of billing judgment seemingly exercised prior to filing of the State's petition. The .1 item for Paralegal Crowley on November 17, 1980, "Find atty in Senita suit for check" was excluded for the same reason.

The State hours (exclusive of Fee Petition time) allowed for lodestar purposes are as follows:

| Attys. | HOURS (Rounded) | | | | | TOTAL all years-Rounded |
|---|---|---|---|---|---|---|
| | 1978 | 1979 | 1980 | 1981 | 1982 | |
| Reed | | | 27 | | | 27 |
| Swan | | | 1 | | 26 | 27 |
| Metzger | 221 | 527 | 125 | 6 | | 879 |
| Eger | | | 61 | 137 | | 198 |
| Paralegals | | | | | | |
| Sirota | | 284 | | | | 284 |
| | | | | | Total | 1415 |

*Special Counsel*—The State's Application for Award of Attorneys' Fees related to the services of Special Counsel (the firm of Reed, Goldstein & Jenkins-Reed) claims the following hours as compensable (exclusive of time devoted to the fee application):

| ATTYS. | 1980 | 1981 | 1982 | Total – All Years |
|---|---|---|---|---|
| Reed | 39 | 215.3 | 141.1 | 395.4 |
| Goldstein | | 3.4 | .2 | 3.6 |
| Jenkins-Reed | | 11.4 | 44.2 | 55.6 |
| Cooper | | | 7.0 | 7.0 |
| Connors | | | 35.3 | 35.3 |
| PARALEGALS | | | | |
| Crowley | | 9.6 | | 9.6 |
| Lawton | | 59.25 | 100 | 159.25 |
| Holland | | 3.0 | .5 | 3.5 |
| | | | | 669.25 |

The defendants object to Special Counsel's claim for time entries which predate December 12, 1980, the date of the Professional Services Agreement. This time, totaling 37.2 hours, will be disallowed. *Hensley*, 103 S.Ct. at 1938.

■ The bulk of Special Counsel's time in dispute involves an *amici curiae* brief which twenty-three states, including Arizona, filed in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Special Counsel solicited these other states to join in filing the brief. Insofar as the record reflects, the State of Arizona, acting through Special Counsel, prepared and filed the brief.

In the *amici* brief the states expressed concern that the Court's opinion might affect the ability of the states to examine peer review fee arrangements under the antitrust laws. Special Counsel argues before me that Arizona was concerned that *Pireno* might cause the Court to overrule or modify its holding in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

Defendants respond that peer review procedures as such were not at issue in the case *sub judice*. Further, they argue that *Royal Drug* was not attacked here or in *Pireno*.

The thrust of Defendants' objections is that no time should be allowed for the *amici* brief in *Pireno*. I think this is an extreme position. A reasonable result lies somewhere between the positions taken by each party.

The basic question is: Would the preparation of the *amici curiae* brief in *Pireno* "have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest" in this case? *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1313 (9th Cir.), ·cert. denied 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). Stated more simply, is it reasonable to conclude that a client would have authorized approximately $25,-000 in fees in a true attorney-client relationship?

Arguably a party to an antitrust action such as Arizona might well be interested in *Pireno* and join with other states in participating as an *amicus*. I think it unreason-

able, however, to expect the entire burden of such an undertaking to be assumed by one state, with the expectation that the cost would be passed on to an adversary in an unrelated antitrust case. The two cases involved basically different issues as demonstrated by the Court's opinion in *Pireno*. As a matter of fact, Justice Brennan wrote the dissenting opinion in *Royal Drug* and the majority opinion in *Pireno*.

Fundamental to this discussion is the fact that the parties in *Pireno* did not seek an *amicus* status in this case. Also, the defendants here did not seek *amici* status in *Pireno*. The Antitrust Division did not record any time entries relative to the *Pireno* brief. The cost of printing the brief was shared by the involved states.

In *Nat. Ass'n of Concerned Vets*, 675 F.2d 1319, the government as defendant, appealed from an award of attorneys fees against it. The government contended, among other things, that the district court erred in allowing the *full amount* claimed for time spent on an *amicus* brief. Id., 675 F.2d, at 1333–34. In ruling favorable to the government on a number of issues, the Court of Appeals admonished the district court on remand to look at the time spent on the *amicus* brief to determine whether it had allowed too much time for that purpose. The Court did not (as implied in Special Counsel's Reply Memorandum, pg. 56), remand to see whether additional time should be allowed:

> ... In addition, the District Court should reconsider the reasonableness of the time spent on the *amicus* brief. Compensable time should not be limited to hours expended within the four corners of the litigation.... However, there must be a clear showing that the time was expended in pursuit of a successful resolution of the case in which fees are being claimed. (citations omitted)

675 F.2d, at 1335.

As I have stated, I fail to find a "clear showing" in this instance sufficient to justify the total time claimed for filing the *amici curiae* brief:

| Name | Approximate Hours |
|------|-------------------|
| Reed | 93 |
| Jenkins-Reed | 40 |
| Lawton | 160 |

The *Pireno* time entries started after this case was argued and extended through April 1982. What happened practically was that the solicitation of the other states and preparing the *amici* brief became another contingent fee proceeding for Special Counsel. The Attorney General's antitrust division did not charge any time against the *Pireno* case.

I have other problems with the *Pireno* time entries. In many instances I find these entries to be vague and lacking in specificity as to what was being done. This is true for Reed, Jenkins-Reed and Lawton.

As an example—Lawton claims more than 120 hours for "Research case material". This includes 5 consecutive 8 hour days. During this same time frame, Reed and Jenkins-Reed are logging substantial time for research, *re amicus* brief.

It is an impossible task for a court to evaluate each hour of time claimed in a fee petition such as the one under consideration. As stated in *New York Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983):

> ... In similar cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application. [citations omitted]. These courts have endorsed percentage cuts as a practical means of trimming fat from a fee petition.

I find that it is reasonable to charge Defendants no more than 90 hours of the *Pireno* brief time. In reaching this opinion I have considered the issues in that proceeding, the interest of the other states, duplicative time and excessive undefined research time. This time will be apportioned as follows:

| | |
|------|------|
| Reed | 50 hours |
| Jenkins-Reed | 10 " |
| Lawton | 30 " |

Defendants also object to certain Jenkins-Reed time charged to the instant case having to do with "Background reading for brief" and "Index cases for Argument". This time will be disallowed. First, there is no reason why a client would expect to pay one of several attorneys for background reading or to index cases. Second, there is no apparent reason why Jenkins-Reed had to index the cases. It should be noted that Paralegal Crowley had previously charged 9.6 hours on October 30, 1981—"Search, copy and Index case file for USSC argument". Jenkins-Reed was in Washington, D.C., prior to the argument, and charged time for indexing, a dinner conference and participating in one of several argument critiques.

I also agree that Reed has logged excessive time in connection with argument preparation before the Supreme Court. Again, this is a matter of judgment and what one would expect a paying client to approve. Ten hours will be disallowed out of more than 40 hours related to Reed's preparation for oral argument.

The time entries claimed by Special Counsel reflect little, if any, analytical review prior to filing the petition with the Court. It is almost as if the matter was being handled in slow motion, with the attorneys and staff discussing, researching and reviewing an issue as a matter of original inquiry each time it came up for consideration. There are more than fifty time entries designated "HTP", i.e., How to Proceed. A client in private practice would soon object to this collegial manner of resolving problems.

■ The fact that a contract counsel for a state agency, working under a contingency fee agreement, may not operate under the same constraints as an attorney in private practice does not serve to justify unreasonable time and related fees.

Special Counsel time as follows (exclusive of Fee Petition time) is allowed for the lodestar calculation:

<u>HOURS</u> (Rounded)

| ATTYS. | 1980 | 1981 | 1982 | 1983 | Total-All Years |
|---|---|---|---|---|---|
| Reed | 2 | 199 | 110 | 7 | 318 |
| Goldstein | 3 | | | | 3 |
| Jenkins-Reed | | 3 | 10 | 3 | 16 |
| Cooper | | | 7 | | 7 |
| Connors | | | 35 | | 35 |
| | | | | | 379 |

| PARALEGAL | 1980 | 1981 | 1982 | 1983 | Total-All Years |
|---|---|---|---|---|---|
| Lawton | | | 30 | | 30 |
| Crowley | 10 | | | | 10 |
| Holland | 3 | | | | 3 |
| | | | | | 43 |

Paralegal time has been included as a part of the lodestar calculation rather than being allowed as costs. Once more, I realize this is an issue as to which courts differ. The use of paralegals, if properly supervised and directed, can be cost effective. It is reasonable to recognize and encourage a continuation of paralegal usage in appropriate circumstances. *Knutson v. Daily Review, Inc.,* 479 F.Supp. 1263, 1272 (N.D.Cal.1979); *Richardson v. Restaurant Marketing Associates, Inc.,* 527 F.Supp. 690, 700 (N.D.Cal.1981).

The other lodestar factor is the hourly rate for each individual.

*Fees*

Plaintiff (Staff and Special Counsel) seeks a current rate for all hours allowed since inception of this proceeding. Defendants object, arguing that reasonable rates should be determined for each year and then applied to the hours in that particular year.

The courts are divided on this issue. *See In Re Equity Funding Corp. of America Securities*, 438 F.Supp. 1303, 1331 (C.D. Cal.1977); *Gautreaux v. Landrieu*, 523 F.Supp. 684, 691 (N.D.Ill.E.D.1981). I have concluded to use historical rates. I will give consideration to the fact that I have done so when evaluating the various *Kerr* elements to determine any lodestar adjustment.

*Attorney General*

■ The defendants object to staff attorneys being compensated at rates equivalent to those charged by attorneys in private practice. Again, this is a question as to which courts have differing opinions. The pros and cons on this proposition are thoughtfully discussed in a law review comment, *Attorneys' Fees to State Attorneys General in Antitrust Actions*, 62 B.U.L.Rev., 493–513 (1982).

I have concluded that it is reasonable in this instance to compensate members of the Attorney General's staff at rates consistent with fees charged by similarly skilled attorneys in private practice. Arguably, the Attorney General's overhead costs and salary schedules are less than experienced by private law firms. To pursue and resolve this difference in costs as suggested by the author of the comment noted above could easily lead to yet another spate of disputes, research, analysis, review, consultation, briefing, etc. The expense of this endeavor would, I am sure, exceed any savings that might be anticipated.

The members of the Attorney General's Antitrust Staff capably handled this case in the district court and through the Court of Appeals. The case was not lost through their stewardship, just as it was not won through Reed's leaving that office and taking over the case as a private practitioner.

After considering the experience of each individual, the nature of their responsibilities in this action, as well as fees approved for certain of them in other antitrust cases, I approve the following hourly rates for staff members, Antitrust Division:

| Atty. | 1978 | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|---|
| Reed | | | 140 | | |
| Swan | | | 100 | | 125 |
| Metzger | 50 | 60 | 70 | 80 | |
| Eger | | 50 | 60 | 60 | 70 |
| Paralegal | | | | | |
| Sirota | | 25 | | | |

In my judgment these rates are as much, or more than any of these individuals would have commanded in private practice during these time periods.

*Special Counsel*

Giving consideration to the same factors as noted for members of the Antitrust Division, and with the same caveat as to rates in private practice, I approve the following hourly rates for the named individuals:

| Atty. | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|
| Reed | 140 | 150 | 160 | 160 |
| Goldstein | 80 | 80 | 100 | 100 |
| Jenkins-Reed | | 80 | 100 | 100 |
| Wischkaemper | | | 100 | 100 |
| Morris | | | 70 | |
| Atty. | 1980 | 1981 | 1982 | 1983 |
| Cooper | | | 125 | |
| Connors | | | 70 | |
| Paralegal | | | | |
| Lawton | | 35 | 35 | |
| Crowley | | 30 | 30 | |
| Holland | | 30 | 30 | |

Morris and Cooper are San Francisco attorneys Reed had prepare a first draft of the State's Reply Memorandum regarding the form of Injunction to be entered after remand. Assuming Special Counsel's staff was not available or adequate for this purpose, there is no demonstrated reason why the State Antitrust Division was not available for this purpose. Accordingly, rates approved for State staff members will be utilized for Cooper and Morris.

The time entries related to preparing and filing this 14 page Memorandum total more than 60 hours. I think this time is excessive and is yet another indication of the fact that little judgment appears to have been exercised to keep unnecessary and duplicative time to a minimum.

### Kerr Guidelines

The Court of Appeals for the Ninth Circuit has set forth twelve factors or guidelines which a district court should consider in awarding attorney fees. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70, (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

The Court summarized these factors in *Moore,* 682 F.2d at 838:

... (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill necessary to perform the legal services properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relations with the client, and (12) awards in similar cases....

The *Moore* court pointed out the obvious fact that not all of these guidelines will be applicable in every case. However, the Court remanded in *Moore* because "the record on appeal fail[ed] to indicate which, if any, of the *Kerr* guidelines were considered". *Id.,* at 838–39.

Accordingly, the record will be reviewed in light of each guideline. Thereafter "the relatively objective lodestar figure" will then be "adjusted based on the quality and risk involved in counsel's efforts". *Id.,* at 840.

Guideline considerations are as follows:

(1) *The time and labor required* —I have earlier concluded that both the Antitrust Division and Special Counsel charged excessive time to this proceeding. The reasons for this may be many.

There is a lack of motivation for an antitrust division of a state attorney general's office to handle a case from a time standpoint like an attorney in private practice. There is little, if any, client review or concern about attorney time or expenses during the course of the proceeding.

Attorneys specializing in antitrust practice are in a similar situation. Again, their clients are ordinarily one or more public agencies, or a class of individuals or corporations, who have limited, if any, contact with or concern about the case as it proceeds. The cases are customarily handled on a contingency fee basis. There is not the immediate need to record time with the same exactitude as private counsel. The time entries will be reviewed retrospectively by a court rather than on a current, on-going basis by a client who is paying the bill. The more time entries recorded, the greater the fee possibility in the event of success in the litigation, i.e., total hours times reasonable hourly rates—the lodestar which guides all antitrust plaintiff counsel. In all too many instances, the allowed fee is determined in a non-adversarial situation. It is a difficult chore at best for a court to study the record, the time entries, and to say "Too much". Particularly, where the fees are to come from a substantial fund accumulated through settlements with defendants.

Excessive time is also suggestive of a lack of expertise or experience, as well as inadequate supervision by the attorney having overall responsibility for coordinating and directing the project.

I did not adjust the hours of any attorney or paralegal as much as my experience and judgment would suggest appropriate. All defendants were represented by counsel. To the extent they considered time excessive for any task, they had an opportunity to object and submit evidentiary support for their position.

(2) *The novelty and difficulty of the questions involved.* Here, not untypically, the prevailing plaintiff now argues that the

case was complex and beset with many problems; the vanquished defendants just as stoutly maintain that the issues were simple and easy of resolution. Such arguments do little to enhance the credibility of either side.

In my opinion, the toughest problem facing the plaintiff at the outset of this proceeding was whether the involved activities were exempt from antitrust consideration within the meaning of the McCarran-Ferguson Act. The district court stayed this action until the United States Supreme Court resolved this issue by its decision in *Royal Drug.* Thereupon, the Court lifted the stay and denied defendants' motion to dismiss.

Factual issues were resolved after limited discovery. Plaintiff's motion for partial summary judgment that defendants' methods of establishing maximum reimbursement levels constituted a *per se* violation of the Sherman Act was denied. The district court certified its ruling for interlocutory appeal. The appellate courts, first the Circuit Court and then the U.S. Supreme Court, were left to decide whether the rule of reason or the *per se* rule was applicable. This was a pragmatic judgment of the involved jurists.

(3) *The skill necessary to perform the legal services properly.* Plaintiff's counsel performed their services competently. The hourly rates allowed reflect this fact. I have already noted the excessive time claimed to perform the tasks.

(4) *The preclusion of other employment by the attorney due to acceptance of the case.* I do not find this to be an important factor. The decision to take a case may affect whether another case can be handled. However, there is nothing in this record to show that other practice of either the Attorney General or Special Counsel was affected to any unusual extent.

(5) *The customary fee.* In the main, I have allowed hourly rates for individuals previously found reasonable for them in other antitrust actions. The individuals involved had varying degrees of experience and responsibility. With the possible exception of Reed, the attorneys had limited litigation experience.

(6) *Whether the fee is fixed or contingent.* Special Counsel's Agreement with the State provided that compensation for professional services was contingent upon recovery of attorney fees in the action. The State agreed to reimburse Special Counsel:

> ... promptly pursuant to bills submitted periodically ... for all reasonable advanced costs, including but not limited to, service fees, filing fees, deposition expenses, reproduction costs, travel, restaurant and lodging expense, fees of experts and the costs and expenses of any associated counsel, and similar costs which are reasonably necessary for the effective prosecution of Arizona's claims.

It appears that in many instances expense claims were not presented promptly and/or periodically. Prompt presentation of claims is an indication that the claims are reasonable and that the client would be expected to make reimbursement without disagreement. On the other hand, there is a natural tendency to delay claim submissions which are excessive or which may meet client resistance.

(7) *Time limitations imposed by the client or circumstances.* This factor does not have particular relevance in this case.

(8) *The amount involved and the results obtained.*

Here again, the parties are in serious disagreement. The State's contention is fulsomely stated in Special Counsel's Memorandum of November 16, 1982, pg. 19:

> It is no overstatement or exageration to say that in the present case counsel overcame overwhelming odds to accomplish an extremely difficult task and that the result of this victory will work a fundamental change in an industry representing 10 percent of our gross national product. The injunction will save consumers tens of millions of dollars annually.

Defendants respond that "the only tangible 'success' plaintiff will have achieved is

the elimination of a desirable and cost-effective health care insurance alternative." Defendants also contest Special Counsel's assertions that this action "introduc[ed] competition into a major section of the economy that had previously been characterized by cartels and monopolistic practices."

I believe the answer to this particular guideline is dictated by the position taken by the U.S. Supreme Court:

> The impact of the foundation fee schedule on medical fees and on insurance premiums is a matter of dispute. The State of Arizona contends that the periodic upward revisions of the maximum fee schedules have the effect of stabilizing and enhancing the level of actual charges by physicians, and that the increasing level of their fees in turn increases insurance premiums. The foundations, on the other hand, argue that the schedules impose a meaningful limit on physicians' charges, and that the advance agreement by the doctors to accept the maxima enables the insurance carriers to limit and to calculate more efficiently the risks they underwrite and therefore serves as an effective cost containment mechanism that has saved patients and insurers millions of dollars. Although the Attorneys General of 40 different States, as well as the Solicitor General of the United States and certain organizations representing consumers of medical services, have filed *amicus curiae* briefs supporting the State of Arizona's position on the merits, we must assume that the respondents' view of the genuine issues of fact is correct.

102 S.Ct. at 2472.

The Supreme Court recognized that its acceptance of the *per se* rule did not constitute a determination that the business practices at issue were unreasonable:

> The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per se* rules. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable. As in every rule of general application, the match between the presumed and the actual is imperfect. For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable.

102 S.Ct. at 2473.

If the injunction entered in this case will save consumers "tens of millions of dollars annually", the practices enjoined must have been costing the public to the same extent. The way is open for any concerned entity— including the State of Arizona—to file a damage action and thus resolve this contention. If successful, the plaintiff(s) and counsel would then be compensated from the common fund developed through that action and their efforts on behalf of the public.[4]

(9) *The experience, reputation and ability of attorneys.* Defendants agree that the services of plaintiff's counsel were of the "highest caliber". They argue, however, that allowing hourly rates in the range requested by plaintiff's counsel is sufficient recognition of their skill and expertise.

In my opinion, the hourly rates which I have approved for each counsel fully compensate them for their expertise in the antitrust area. These rates are also more than adequate to compensate them based on their experience, reputation and ability as attorneys in this community.

(10) *The "undesirability" of the case.* Again, this does not seem to be a decisive guideline. The Attorney General determined to file the action under statutory authority. The complaint did not seek a

---

**4.** The $1.8 million dollar monthly damage figure Plaintiff seeks to utilize was not developed by Defendants. Rather, it originated with Plaintiff in its Motion filed January 12, 1979 to Vacate or Modify Stay Order of December 27, 1978. (Document 74, p. 17) Maricopa Foundation later referred to Plaintiff's calculation as "grossly inflated". (Document 103, p. 6).

damage award. Reed was the Antitrust Division Chief when the case was filed.

There is no evidence that the prosecution of other antitrust actions was delayed or suffered as a result of the filing of this action.

(11) *The nature and length of the professional relations with the client.* This guideline only involves Reed. He was a member of the Attorney General's staff for a number of years. When he left that office and went into private practice, he was awarded a contract to handle this case as special counsel. Several of the individuals with Reed's firm had previously been with the Attorney General's office.

Reed had an ongoing relationship with the Attorney General's office after November, 1980 in other cases. He has appeared as Special Counsel for the State in at least two other antitrust cases. *In re Cement and Concrete Antitrust Litigation,* Civ 78–271–72; *In re Arizona Escrow Fee Antitrust Litigation,* Cic 80–840A. Both of these cases were filed while he was a member of the Attorney General's staff and were progressing while he was involved in the instant case. He has received fee awards in the two named cases out of settlement funds. The *Cement* case is now scheduled for trial in April, 1984.

(12) *Awards in other cases.* It is difficult to draw any overall conclusions as to the totality of an award to be made in a particular case, by looking at awards in other cases. The circumstances of cases differ widely. The variables include, among others, issues, extent of discovery, court appearances, the time period over which the case extended, the number of individuals involved and their functions in the proceeding, results obtained, total hours claimed, hourly rates and whether the award was made in an adversarial situation.

I have considered other awards in this district in fixing the hourly rates for attorneys and paralegals in this proceeding.

I have also reviewed the innumerable cases called to my attention through memoranda. There is something for everyone in those cases. The final award in those cases was a discretionary judgment, just as mine will be in this instance. An adherence to the *Moore* requirements should provide a reasonable award in each individual case, with appellate court review available to a dissatisfied claimant.

Special Counsel cites a fee order (Settlement Order No. 6) in *In re Arizona Escrow Fee Antitrust Litigation,* Civ. No. 80–840A, in support of its claim as to hourly fees, counsels' expertise and the substantial multiplier requested. My review of that order confirms that it was prepared by a fee committee of plaintiffs' counsel, of which Mr. Reed was a member. I consider that order and others prepared by similar committees in common fund cases, as limited authority. At best, they should be regarded in the same way as the circuit courts consider findings of fact prepared by counsel and entered verbatim by a trial court. *Photo Electronics Corp., v. England,* 581 F.2d 772, 777 (9th Cir.1978); *Griffen v. Big Spring Indep. School Dist.,* 706 F.2d 645, 656 (5th Cir.1983). (on appeal).

*Fee Petition Hours*

Counsels' applications for award of attorneys fees include time for preparing and pursuing those applications.

The Antitrust Division claims 73.8 hours for these purposes:

HOURS

| Atty. | 1982 |
|---|---|
| Swan | 45.3 |
| Eger | 28.5 |
| Total | 73.8 |

Special Counsel's time entries for this purpose total 288.8 hours through 1983:

HOURS

| Atty. | 1982 | 1983 | Total |
|---|---|---|---|
| Reed | 82.7 | 16.6 | 99.3 |
| Goldstein | 74.5 | 22.1 | 96.6 |
| Jenkins-Reed | 18.8 | | 18.8 |
| Wischkaemper | 36.7 | 15.8 | 52.5 |
| Morris | 19.9 | | 19.9 |
| Cooper | .5 | | .5 |
| Paralegal | | | |
| Crowley | | 1.2 | 1.2 |
| | | | 288.8 |

Defendants object, contending that time for these purposes is customarily disallowed. As plaintiff points out, the authorities relied on by defendants are cases involving a common fund, whereas it is almost uniformly held that reasonable time claimed for fee issues is allowed the prevailing party in non-fund cases.

The reasons for this dichotomy are: The prevailing attorneys in a common fund case will be the recipients of an award based on the lodestar calculation, with almost inevitable enhancement after a nonadversarial consideration by a court of *Kerr* · type guidelines. Compensating the attorneys for preparing their fee petitions cannot arguably benefit the class and/or increase the fund. Ergo, those types of fee petitions are regularly disallowed.

■ Here, there is no fund out of which counsel may be compensated. If the prevailing party is to suffer no loss through bringing the action, and others are to be encouraged to bring similar public interest actions, the unsuccessful party may be required to pay a reasonable attorney fee. The extent to which a fee petition is contested necessarily adds to the time logged by counsel for the prevailing party. The opposition may be pedantic or it may result from the nature or extent of fees sought by the other party.

A losing party in an antitrust action would be well-advised to contest only those attorney fee issues, factual or legal, as to which there is grounds for fair dispute. Otherwise, the successful party is afforded the opportunity to expand the basic fee dispute itself into a substantial fee generating proceeding.

■ One proposition is evident: A multiplier should not be applied to the hours spent on an application for attorneys fees. The "risks" incident to prevailing in the proceeding on the merits are gone. Any delay in the resolution of the fee application should be no different than that occasioned in resolving an attorneys fee claim in any other action where an application is permitted. *In re Equity Funding Corp. of Am. Securities Litigation,* 438 F.Supp. 1303, 1330, C.D.Cal.1977; *Weiss v. Drew Nat. Corp.,* 465 F.Supp. 548, (S.D.N.Y. 1979). I do not regard the opinion in *Kooistra v. Phoenix Newspapers, Inc.,* Civ 82–946–Phx, cited by Reed, as persuasive authority to the contrary. This issue was not expressly dealt with in the Court's opinion. It did not discuss cases which considered the issues and denied a multiplier.

For the same reasons stated in *Vulcan Soc. of Westchester Cty v. Fire Department,* 533 F.Supp. 1054, 1966 (S.C.N.Y. 1982) "... even assuming the Court has discretion to apply the multiplier to the time spent on this motion, it declines to do so."

■ The Attorney General and Special Counsel each submitted separate fee applications, with opening memoranda and extensive memoranda in response to Defendants' objections.

Three Hundred sixty-two hours (362.6) are claimed for preparation and presentation of the two fee petitions. Using that time and hourly rates approved by the Court, would result in an award to the Attorney General of $7,657.50, with an award to Special Counsel of $34,169.50.

I find the time claimed for fee petition purposes is excessive and unwarranted. The separate memoranda are duplicative and unnecessarily prolix. A single, coordinated presentation could easily have been utilized. Rather, each set of counsel embarked on an independent research and drafting project, with a seeming lack of expertise or experience in fee petition matters. Special Counsel even found it necessary to employ five of the firm members on the project. This is a type of luxurious law practice which I do not believe exists generally in the private practice of law, and certainly not for purposes of preparing a fee petition. It is inevitable that this number of persons on a project spawn wasted hours and propagate duplication of time.[5]

---

**5.** The Fee hearing on December 20, 1982 is an example. Four Reed attorneys charged time for

Counsels' prior involvement in antitrust cases is the only basis upon which I approved their hourly rates. That activity necessarily encompassed fee applications in those kindred cases. I have reviewed the fee petitions in other cases involving the Attorney General's office and Reed. I found essentially the same cases cited and similar—if not identical arguments advanced as in this proceeding. Stated most directly, I find that the time entries here (as elsewhere in this case) demonstrate an excessive belaboring of research and preparation of memoranda. As the Court stated in *Ramos v. Lamm*, 539 F.Supp. 730, 741 (D.Colo.1982), "[o]ne should not have to pay for the building of a clock in order to find out the time of day." Continuing with that analogy, assuming the cost of building the clock is relevant, the time necessary to build additional clocks should be less after the initial invention.

The rule which I have followed is well-stated in *Lund v. Affleck*, 587 F.2d 75, 77, (1st Cir.1978):

> ... It would be inconsistent with the purpose of the Fees Act to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee [citations omitted]. On the other hand, if the attorney's initial claims are exorbitant, or the time spent advancing them unreasonable, the district court should refuse the further compensation. The same point we have emphasized in all fee situations applies here: it is not enough for the court to multiply a fixed rate by the number of hours claimed. The court must satisfy itself of the overall fairness and reasonableness of the fee under all the circumstances....

The only practical way that I can resolve these claims is by an across the board reduction to correct for what I find to be excessive and redundant hours. It is my best estimate, based on a review of the hours claimed and the issues involved, that a total time of 175 hours would be reasonable for fee petition purposes. This time covers preparation of the petition and responding to objections of defendants, as well as providing supplemental information requested by the Court. *Perkins v. Standard Oil Company of California*, 474 F.2d 549 (9th Cir.1973), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973); *Gagne v. Maher*, 594 F.2d 336, 345 (2d Cir.1979), *affirmed*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Again, it should be recalled that the hourly rates allowed counsel are intended to compensate them for their special expertise. Otherwise, these rates would be significantly lower.

My earlier findings with respect to the *Kerr* guidelines are applicable to this determination.

Fifty of the one hundred seventy-five hours will be allocated to the Attorney General, with the balance to Special Counsel. For purposes of determining the awards in this instance, I will use average hourly rates of $105 and $120, respectively:

Attorney General

| 50 hours × $105 | $ 5,250 |
|---|---|

Special Counsel

| 125 hours × $120 | $ 15,000 |
|---|---|

### Quality and Risk Considerations

The appropriate procedure in this Circuit for calculating a fee award is described in *Moore*, 682 F.2d at 840, as a "blended" approach, utilizing the "straight lodestar analysis" and the "*Kerr* guidelines." The result of this blended approach is a determination "whether to augment or decrease the award based on quality or contingency considerations." These two considerations will be considered separately.

*Quality*—The Court in *Lindy Bros. Builders, Inc., v. Am. Radiator, Etc.*, 540 F.2d 102, 117 (3rd Cir.1976) (Lindy II) pointed out:

---

attending this hearing. The time for two attorneys was deleted in a supplemental filing in

October, 1983.

... that a consideration of 'quality' inheres in the 'lodestar' award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed. Thus, the quality of an attorney's work *in general* is a component of the reasonably hourly rate; this aspect of 'quality' is reflected in the 'lodestar' and should not be utilized to augment or diminish the basic award under the rubric of 'the quality of an attorney's work'. (Emphasis in original)

The *Lindy II* Court emphasized that an increase or decrease in the lodestar is to reflect "exceptional services only" and:

... The heavy burden of proving entitlement to such an adjustment is on the moving party.

 Plaintiff's counsel handled the case to a successful conclusion, i.e., they prevailed on its *per se* position. I find no reasonable basis for concluding however, that they did so with a "minimum of time invested", or that they should be rewarded because they secured a "substantial benefit" for the public. Accordingly, a quality multiplier will not be allowed.

I have considered applying a negative multiplier because of what I perceive to be a practice of overstaffing, duplication of effort and the accumulation of excessive time throughout this antitrust proceeding. *In Re Fine Paper Antitrust Litigation,* 98 F.R.D. 48, 84 (E.D.Pa.1983). I did not employ this type of multiplier in view of the time which I disallowed. If additional time was allowed, a substantial negative multiplier would be utilized.

*Risk*

 *Lindy II* instructs, 540 F.2d at 117:

Under the rubric of 'the contingent nature of success' the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit.

Three factors, with various elements were suggested as particularly relevant:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.

The *Kerr* guidelines are essentially an iteration of the *Lindy II* criteria.

One fact not previously mentioned is worth noting here. The Attorney General was able, under statutory authority, to engage in prefiling discovery. Antitrust staff members also discussed the prefiling investigation with Department of Justice personnel. Plaintiff is being compensated for all of this time.

The Attorney General was at risk for a much longer period of time than Special Counsel. Having initiated the action, the State had an ethical obligation to proceed to a final conclusion.

The State was responsible for advancing all costs and expenses incident to the case. Special Counsel's contract, as noted earlier, enabled him to obtain reimbursement on a timely basis for reasonable amounts advanced for a myriad of purposes. The fact

that he failed to seek reimbursement is not a risk incident to this litigation.

Special Counsel's contract to represent the State was secured through what was stated at the Fee hearing to be some type of bidding process. This occurred within weeks of Reed leaving his position as Chief of the Attorney General's Antitrust Division. He was certainly aware of, and from a supervisory standpoint, responsible for prior proceedings and the status of the case when he signed on. The Attorney General's Office on December 12, 1980, was then, or soon to be, a several times client of Reed. To read Special Counsel's Fee Petition Memorandum one would conclude that he boarded a derelict ship hopelessly adrift in the Sargasso Sea and miraculously brought it into harbor, refurbished and resplendent. And without any assistance from its earlier crew. I say nonsense.

Special Counsel and Defendants' counsel engage in a spirited exchange as to the relative possibilities of the United States Supreme Court taking the case on certiorari when Reed became Special Counsel. I do not regard this statistical exercise as a meaningful measure of risk. Reed, within the parameters of his experience, could readily estimate the number of hours necessary to brief the case if certiorari was granted. I suspect that most lawyers and particularly those of the antitrust bar, would welcome the opportunity to prepare and argue any antitrust case before the Court. Particularly so, where prior to the lawyer being engaged, the Court had invited the Solicitor General to file an amicus brief regarding the merits of the certiorari petition.

Probably as good an assessment as any of the Supreme Court taking the case, was that expressed by H. Robert Halper, in 49 Antitrust Law Journal 17, 26–27 (1980), in an article titled "The Health Care Industry and the Antitrust Laws: Collision Course?":

> ... The Ninth Circuits two-to-one decision on March 20, 1980 produced three opinions and an almost certain ticket to the Supreme Court. At stake is whether the *pro se* approach or the rule of reason approach should apply to what was conceded to be an agreement by the county medical society physicians on the maximum fees they would be reimbursed by a health insurance plan they had established.

*Multiplier*

After considering the varying risk considerations of the State Attorney General and Special Counsel, I have concluded to use a risk multiplier of 1.4 for each. This multiplier will be applied against the lodestar calculations, exclusive of Fee Petition time.

I recognize that on occasion, courts have not applied the multiplier to time spent subsequent to the date that the risk was substantially eliminated by a favorable decision on the merits. Here, that would be sometime in mid-1982, following the Supreme Court's Opinion. I did not consider it necessary or reasonable to do so in this instance, given the amount of time involved and the overall delays occasioned in resolving the attorney fee issues.

*Summary*

■ The following attorney fees are allowed Plaintiff's counsel:

Attorney General

| | |
|---|---|
| Lodestar of $77,300, with a multiplier of 1.4 | $ 108,220 |
| Fee Petition award | $ 5,250 |
| Total Award | $ 113,470 |

Special Counsel

| | |
|---|---|
| Lodestar of $55,395, with a multiplier of 1.4 | $ 77,553 |
| Fee Petition award | $ 15,000 |
| Total Award | $ 92,553 |

*Costs and Expenses*

These items will be resolved in a supplemental order.

Accordingly,

IT IS ORDERED that the Clerk of the Court is directed to enter Judgment in favor of Plaintiff and against Defendants, jointly and severally, as and for attorneys fees, in the total amount of $206,023.

IT IS FURTHER ORDERED that Judgment in such amount shall be entered forthwith. There is no just reason to delay entry of this Judgment pending resolution of the disputes with respect to the lesser amount of costs and expenses.